VAN PATTEN v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court, N. D. Iowa, W. D. June 29, 1897.)

1. ACTION FOR DAMAGES UNDER INTERSTATE COMMERCE ACT — NECESSARY SHOWING.

When relief by way of damages is sought under the provisions of the interstate commerce act, upon the averment that a shipper has been charged an unreasonable rate for goods transported by a railway company, the plaintiff, in order to be entitled to recover, must show that the rate charged is unreasonable according to the provisions of that act.

2. SAME—STANDARD OF REASONABLE RATES.

The interstate commerce act provides for and prescribes a standard by comparison with which it may be determined whether a given rate is or is not to be deemed unreasonable within the meaning of the act; and that standard is the rate adopted, printed, and kept posted, as required by the statute, by those engaged in the business, and subject to the effects of free competition. Courts and juries cannot resort to any other standard.

3. SAME—ACTIONS FOR DAMAGES—DEFENSES.

It is a good defense to an action for damages for alleged extortionate, unjust, discriminating, and unreasonable freight charges to show that the defendant, in obedience to the interstate commerce act, has adopted, printed, and posted a properly proportioned schedule of rates, and that the charges complained of are in accordance with those in the schedule.

Submitted on Demurrer to Answer.

Harl & McCabe and Spencer Smith, for plaintiff.

George R. Peck and Burton Hanson, for defendant.

SHIRAS, District Judge. In the first count of the petition filed in this case the plaintiff avers, in substance, that in the year 1893 he shipped over the line of railway owned and operated by the defendant railway company, between the town of Manning, Iowa, and the city of Chicago, Ill., certain car loads of grain for which the railway charged a rate per 100 pounds, it being then averred:

"That said rate so charged was an unjust, unreasonable, and extortionate charge for such service, and subjected this plaintiff and the town of Manning

81 F.—35

to an undue, unjust, and unreasonable prejudice, disadvantage, and extortion and discrimination, all contrary to the provisions of the act of congress approved February 4, 1887, entitled 'An act to regulate commerce,' and the amendments thereto. That all of said rate in excess of 17 cents on corn and 20 cents on wheat, per 100 pounds, was unjust, unreasonable, extortionate, and discriminating, and subjected plaintiff and said Manning to unjust and unreasonable prejudice and disadvantage; the amount of said unlawful overcharge on each of said shipments being in the sum and amount set out in Exhibit No. 1, headed 'Overcharge,' and in the total amount on the shipments herein referred to and in Exhibit No. 1 set out in the sum of $77.72. That by reason thereof the plaintiff has been damaged in the sum of $77.72."

The petition contains in all some 23 counts, based upon shipments of grain from various places in Iowa and South Dakota in the years 1891, 1892, 1893, 1894, 1895, and 1896, and the total damages claimed are in excess of the sum of $54,000.

To these several counts the defendant answers, among other things, that ever since the taking effect of the act of congress approved February 4, 1887, and commonly known as the "Interstate Commerce Act," it had, in accordance with the requirements of that act, adopted schedules of rates, showing the charges established for the transportation of freight over its lines of railway, and had kept these schedules, duly printed, posted up in its depots and offices, as required by the statute; and that the charges by it made for the transportation of the grain, described in the several counts of the petition, were in accordance with the schedule rates thus established, adopted, and made public as required by the interstate commerce act, and that the shippers made their several shipments and paid the scheduled rates therefor without demur or protest. To the several paragraphs of the answer setting up these general facts in different forms, a demurrer is interposed, based upon the proposition that if the rate charged for the shipment of the grain was unreasonable, then it is no defense to show that the rate charged and paid was the schedule rate. The theory of the plaintiff is that section 1 of the interstate commerce act declares that all charges made for the transportation of property shall be reasonable and just, and every unjust and unreasonable charge for transportation services is prohibited; that section 8 of the act declares that any common carrier who does anything prohibited by the act is liable for the damages caused thereby to the person injured; and that section 9 provides for an action at law in the courts of the United States for the recovery of the damages for which the carrier may be liable under the provisions of the act; and that in all cases it is a matter of fact, to be determined by the jury, whether the particular charge complained of was or was not reasonable. It will be noticed that the declaration of section 9 is that a person claiming to be damaged may bring suit in a court of the United States "for the recovery of the damages for which such common carrier may be liable under the provisions of this act." To sustain a recovery under this section, it must appear that the damages arise from a violation of the provisions of the act, and therefore, when the right to recover damages is based upon the averment that a given rate exacted of a shipper is unreasonable, we must have regard to the provisions of the act in determining whether the rate

complained of is reasonable or unreasonable. It will not be questioned, I presume, that the damages recoverable under the provisions of section 9 are those, and those only, which arise from a violation of some of the requirements of the interstate commerce act. Therefore, when relief by way of damages is sought under the provisions of the interstate commerce act upon the averment that a shipper has been charged an unreasonable rate for goods transported by a railway company, the plaintiff, to become entitled to recovery, must show that the rate charged is unreasonable according to the provisions of that act. Thus, if the interstate commerce act, construed in its entirety, has recognized, provided for, or prescribed a standard for determining whether rates charged by common carriers, subject to the provisions of the act, are reasonable or not, then it cannot be predicated of a rate charged that it is unreasonable, if it appears that it conforms to the recognized or established standard.

Thus we are brought to a consideration of the question whether the interstate commerce act provides for or prescribes the standard by comparison with which it may be determined whether a given rate is or is not to be deemed unreasonable within the meaning of the act. The intent of congress is to be gathered from a consideration of the entire act, and not solely from detached portions thereof, and the familiar rule of construction is to be followed, to wit, that, in determining the meaning of the words employed, the general purpose of the act and the evils sought to be remedied must be always kept in mind, and, furthermore, parts of the act are not to be so construed as to defeat other important features of the same; nor is such a construction to be given to the act, in whole or in part, as may tend to prevent the proper enforcement of the legislative purpose. Thus, in Pennington v. Coxe, 2 Cranch, 33, Mr. Chief Justice Marshall, speaking for the supreme court, said:

"That a law is the best expositor of itself; that every part of an act is to be taken into view, for the purpose of discovering the mind of the legislature, and that the details of one part may contain regulations restricting the extent of general expressions used in another part of the same act,—are among those plain rules laid down by common sense for the exposition of statutes which have been uniformly acknowledged."

In Kohlsaat v. Murphy, 96 U. S. 153, it is said:

"In the exposition of statutes, the established rule is that the intention of the lawmaker is to be deduced from a view of the whole statute, and every material part of the same. * * * Resort may be had to every part of a statute, or, where there is more than one in pari materia, to the whole system, for the purpose of collecting the legislative intent."

In Platt v. Railroad Co., 99 U. S. 48, it is declared:

"We are seeking for the intention of congress, and to discover that we may look at the paramount object which congress had in view, as well as the means by which it proposed to accomplish that object."

In Lau Ow Bew v. U. S., 144 U. S. 47, 12 Sup. Ct. 517, it is said:

"Nothing is better settled than statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or absurd conclusion."

In Holy Trinity Church v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, we find it declared:

"Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events,—the situation as it existed, and as it was pressed upon the attention or the legislature."

"All acts of the legislature should be so construed, if practicable, that one section will not defeat or destroy another, but explain and support it." Bernier v. Bernier, 147 U. S. 242, 13 Sup. Ct. 244.

And in Smith v. Townsend, 148 U. S. 490, 13 Sup. Ct. 634, it is said:

"It is well settled that where the language of a statute is in any manner ambiguous, or the meaning doubtful, resort may be had to the surrounding circumstances, the history of the times, and the defect or mischief which the statute was intended to remedy."

With these rules for our guidance, it is not difficult to ascertain the causes which brought the interstate commerce act into being, the evils sought to be remedied, and the general system which was inaugurated by the enactment made. The development of railways during the past 50 years had been so great that practically the carrying trade of the country had passed into their hands, especially in the portions of the country not bordering on the lakes or larger rivers. The business had grown so enormously, and the mode of handling the same had become such, that it was no longer possible for each shipper to make special contracts with the carrier for the transportation of his property. The railway lines extend over thousands of miles of territory, with hundreds of stations or shipping points, and it was impossible for the carrier to have at each shipping point an agent with the authority to contract with each shipper with respect to the rate to be charged upon each shipment. Therefore it became the custom for each railway to adopt general schedules of rates, which were furnished to their agents for their guidance in billing freight. These schedules, however, were not always made public, and it was soon developed that, notwithstanding the adoption of these schedules, which could not be varied from by the local or station agent, many shippers and localities were favored in the matter of rates, or, in other words, discrimination in favor of particular classes of business, or of particular localities, or of favored individuals became a common practice; the same being accomplished in many ways, but more generally through a system of rebates which were arranged for with the officials who had the power to make or change the schedule rate. As was naturally to be expected, these rebates would be secured the more easily by heavy shippers, and by men carrying on their business in the larger cities, who could readily reach the railway officials, and the inevitable result was that the smaller dealers, and those who were located in the small towns and villages of the land, were put at a disadvantage, which in many instances was of so serious a nature as to drive them out of business. Furthermore, the practice obtained of adopting certain lines of rates at competitive points, which would be less than those charged from noncompetitive points, although the latter might be nearer the point or place of delivery. Thus there had grown up a system of discrimination which resulted in placing unequal burdens upon the shippers, and, through them, upon the community at large; and

the discontent resulting therefrom was the most potent cause which operated to bring about the enactment of the interstate commerce act. Though not the only, it was the principal, evil sought to be remedied by that enactment. Another difficulty of which the public complained resulted from frequent and sudden changes in rates. It is well known that a large part of the products of the country are purchased from the producer at or near the place of production, and the shipping to market is done by the purchaser or middle man. Whether the purchases thus made are to prove profitable or the contrary depends largely upon the cost of transportation. Every one engaged in the purchase and shipment of the products of the farm or of the manufactory must figure upon the freight rate in determining what price he can afford to pay, and, unless he can place reliance upon the established rate, he is liable to suffer loss through a sudden increase in freight rates; and hence the desirability of having the rule established that the carrier cannot change established rates without reasonable notice. The final complaint of the public was that from the mode in which the carriers imposed their charges it resulted that the rates were unequal; that to make good the loss resulting from the favoritism shown to particular localities, persons, or classes of business a greater burden was placed upon the remainder of the traffic; and that through the practical monopoly acquired by the railways over the transportation business of the country the shippers were largely at the mercy of the carriers, and that as a result thereof the business of the community, in so far as the same depended upon the use of transportation facilities, was subjected to unequal and unreasonable burdens and exactions.

Thus we have presented the general causes which impelled congress to undertake legislation for the purpose of regulating interstate commerce. The first five sections of the act are devoted to defining the general principles which should govern common carriers in the transaction of the transportation business of the country; rates or charges for services rendered must be reasonable; must be equal for like service; no undue or unreasonable preference or advantage is to be given to any locality, person, or kind of traffic; a greater compensation must not be charged for a shorter than a longer haul under like circumstances, and competition must not be defeated by pooling contracts or agreements between two or more carriers. Coming now to the sixth section, we find therein provision made looking to the enforcement of the general principles contained in the preceding sections, and this provision consists primarily in the requirement for the adoption, printing, and posting up for public inspection of schedules showing the rates and charges established by the particular carrier. The slightest reflection shows that the adoption of a schedule of rates is a necessity of the situation. It forms the foundation of the whole system, and is an essential element in the creation and enforcement of any method of regulation which holds out the promise of successful results. It was open to congress to declare by whom and upon what basis the schedule of rates should be adopted. Provision might have been made for a commission to that end, or con-

gress might have prescribed the limits, but it did not. The declaration of section 6 is that the schedules which are to be printed and posted are to consist of the rates and charges for the transportation of passengers and property which the common carrier has established. The theory of the entire act is that, owing to the effect of free competition, railway companies will charge at competitive points only fair and reasonable rates. The rates thus established at competitive points furnish a standard for the rates at noncompetitive points, and thus it is proposed in time to secure the adoption of a reasonably fair and equal schedule of rates. However this may be, it cannot be questioned that under section 6 every common carrier subject to the act is compelled to adopt, print, and keep posted a schedule of rates and charges as established by it, and it is then enacted that: "When any such common carrier shall have established and published its rates, fares and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any service in connection therewith, than is specified in such published schedule of rates, fares, and charges, as may at the time be in force." Provision is then made for changes in the schedule, requiring, in case of an advance in rates, that 10 days' notice thereof shall be given. It is certainly the intent of congress to require of the carrier the adoption of a schedule of rates, and to make the same public; and it is equally certain that it is the duty of the carrier to charge the schedule of rates, neither more nor less, until a change is made therein according to law. There can be, therefore, no question that congress has, by this method, provided for the adoption of a fixed schedule, and has declared that the carrier must not deviate therefrom, provision being made for changes from time to time, as experience may show that the rates adopted are inequitable, or as changes in the circumstances may justify or demand a readjustment of the schedule charges. Therefore when a carrier, as in this case, is sued for damages on the ground that the rate charged for transportation of grain was unreasonable, it is competent and proper for the carrier to aver and show that in obedience to the interstate commerce act it had adopted, printed, and posted a schedule of rates, and that the charges complained of were in accordance with those contained in the schedule.

It is contended, however, on part of plaintiff, that as the first section of the act declares that the rates charged must be reasonable, and as section 8 declares that the carrier shall be liable to any person injured for the damages resulting from the doing of any act or thing prohibited, it is open to the plaintiff to now show that the schedule rates charged and paid without demur during the past five years were unreasonable, and therefore damages for charging the same are recoverable; and that, if this be not so, then the provisions of the act providing the right to sue for and recover damages for violation of the act are meaningless. If the carrier, after adopting, printing, and posting the schedule of rates as required by the

act, should charge or exact from a shipper in any form or by any device a rate greater than that fixed in the schedule, an action for damages would be maintainable, and in such case there would be no difficulty in defining the rule of damages, to wit, the difference between the schedule rate and that actually exacted.    So, also, if the schedule on its face provided for the imposition of unfair and inequitable rates,—as, for instance, if it should require the payment of a greater charge for the transportation of freight for a shorter than for a longer distance, other things being equal,—an action might be maintained, and in that case a rule of damages could be based upon the provisions of the schedule itself, by taking the schedule rate for the longer distance as the basis for determining what the proper rate for the shorter distance should be.    In the present case, however, the proposition of the plaintiff is that, after the carrier, in obedience to the requirements of the act, has adopted, printed, and posted a schedule of rates, and for the past five years has received and transported grain, charging the schedule rates therefor, and the shipper, without protest or demur, has delivered his grain for shipment, knowing the schedule rate, and has paid the charges in conformity with the established rate, he may now, and at any time within the period of the statute of limitations, bring an action at law for damages, not on the ground that more than the schedule rate was exacted, or that the schedule itself provided for unequal, and therefore unjust, rates, but solely upon the ground that the schedule rates, though uniform, and properly proportioned, were greater than they should have been; and thus the question is presented whether the interstate commerce act, considered as a whole, authorizes and provides for an action of this kind.    If it can be maintained, it results in the holding that it was the intent of congress to place upon the courts and juries of the country the duty and burden of establishing the rates of transportation for interstate commerce, and upon the common carrier the burden of transportation, with the right to ultimately retain as pay therefor the rate fixed by the verdict of a jury rendered perhaps five years after the rendition of the services.    How is it possible for a jury to pass understandingly upon the questions which inhere in the establishment of a properly proportioned and equalized schedule of transportation rates.    Take this case as an example.    As already stated, the petition contains 23 counts, each count being based upon shipments made from a different point, and at each point the shipments were made at many different times within the limits of from one to five years.    Now, the theory of the plaintiff is that the jury must inquire into and determine what the reasonable rate was for each shipment when made, and, by comparing the reasonable rate thus fixed by the jury with that actually charged, determine whether the plaintiff is entitled to damages, and, if so, to ascertain the amount on each shipment made.  ·  It is self-apparent that, no matter how intelligent the jury might be, nor how conscientiously and carefully they might endeavor to deal with the problem thus submitted to them, it would be wholly impossible for them to reach a proper verdict under such circumstances.

But suppose the case involved but a single shipment, would the difficulty be remedied, if the theory of the plaintiff is to prevail? How could the jury fairly and understandingly deal even with the case of a single shipment, provided the duty is placed upon the jury of determining what a fair and reasonable charge for the particular service would be, unless some standard, already recognized and established, is given them for their guidance? It is impossible for the jury to deal with the questions of the total cost of building, equipping, and operating the line of railway as a whole, the proportionate cost of the particular transportation in question, the total amount of business done over the entire system, the total burden properly to be laid upon the total business for transportation charges, and the proper proportionate share which the particular shipment should bear. If these general lines of inquiry are not available as guides for the jury in reaching a solution of the question, can recourse be had to any other standard of charges than that which may be likened to the market rate, and which is the result of free competition among those engaged in the business of common carriers? If it be the fact that as the result of free competition among carriers certain rates have been established for given services, what better guide could be given to the jury, when they are called upon to determine whether a rate exacted by a carrier from a shipper is or is not reasonable, than the rate adopted by those engaged in the business, and subject to the effects of free competition? As I construe the act, this standard or guide is provided by the act in question. The statute is based upon the principle, which is the controlling element in regulating prices, values, and rates in the general commercial and manufacturing business of the country,—self-interest controlled by free competition. When the act was adopted, congress well knew that every railway line was using, and would continue to use, its utmost endeavors to secure as large a share of the transportation business within its reach as it was possible for it to do. The great complaint was that each railway, by means of secret rebates or other like devices, was endeavoring to outstrip its rivals in securing business. The theory of the act is that, if competition is left free at all points where two or more lines come into competition, there will be found established reasonable rates. If, in scheduling its rates as required by the act, a carrier should increase the rate beyond a reasonable limit, its competitors would speedily capture the business at the competitive points, and of necessity, and under the spur of self-interest, the carrier would be compelled to reduce the rate to one that was reasonable. Hence the act forbids pooling and all combinations having for their purpose the establishment of rates by agreements between competing carriers. Having thus provided for securing reasonable rates at competing points, a basis is found for the establishment of like reasonable rates at all intermediate places where direct competition does not exist, by the adoption of the clause forbidding a greater charge, under like circumstances, for a shorter than a longer haul, and by the liability of the carrier to damages if the schedule adopted and posted shows that a rate out of propor-

tion, and therefore unreasonable, has been fixed for any of the points named in the schedule.

These are the means provided for securing reasonable rates. By the provision requiring 10 days' notice of a proposed increase in the rate, the evil resulting from sudden and unforeseen fluctuations in the rates charged was sought to be guarded against; and, lastly, the greatest evil of all, that of unjust discrimination in favor of persons, places, or classes of business, was sought to be remedied by the provisions of the act prohibiting all undue preferences or advantages to persons, places, or classes of business, forbidding all special rebates, drawbacks, or other like devices, and by the requirement that the carrier must adopt, print, post, and thereby make public an established schedule of rates, and must not charge rates either greater or less than those set forth in the printed schedule. The act requires that the rates charged shall be reasonable, but the standard of reasonableness under the act is that which results from free competition among the carriers, which can be known when the carrier undertakes the duty of transportation, and which the act requires shall be set forth in the schedule posted by the company, and not a rate estimated by a court and jury years after the services have been rendered. If this suit can be maintained upon the contention advanced in support thereof, then the common carriers for the past five years, or whatever the period of limitation upon the right to sue may be, have been engaged in the transportation business of the country without knowing, and without the means of knowing, what remuneratio i they are ultimately to receive for the work done. If plaintiff's contention be sound, every person who, within five years past, more or less, has secured transportation for his property or person over a line of railway engaged in interstate business, can now sue the company, claiming damages on the ground that the rate charged and paid without demur was unreasonable; and in each case it will be for the jury to determine, as best they may, what a reasonable rate is, and award damages accordingly. The consequences that would follow if that contention be true need not be elaborated upon, but it is sufficient to say that it would speedily wreck every railway in the country.

Furthermore, if it be true that the establishment of reasonable rates for railway services is to be left to the verdict of juries, rendered long after the services have been performed, it is apparent that it will be wholly impossible to secure equality or uniformity therein, and of necessity preferences would result therefrom in favor of individuals and localities, thus violating the most important principle of the act in question. If the plaintiff maintains this action on the theory now contended for, and recovers damages in the sum of $50,000 or thereabouts, this will have the same effect upon the shipments counted on in the petition as though the company should now allow a rebate for that amount, and these shipments will secure an advantage over all others made along the line, and upon which the schedule rates have been paid. To secure uniformity, it will be necessary for every shipper not only to see to it that he and all other

shippers are charged the posted schedule rates, but also to take note whether suits are brought for the recovery of damages, for, unless he does so, and promptly sues himself in case others do, he may find that a jury has greatly reduced the rate, by way of damages in favor of some competitor, and thus he is placed at a disadvantage. More-over, it would render it not only possible, but a matter of compara-tive ease, for the carrier and favored shippers, to provide for rebates upon the schedule rates. The shippers can pay the scheduled rates. At the proper time suit can be brought to recover damages for an un-reasonable charge. A jury can be readily convinced, in the absence of a vigorous defense, that the claim for damages is just, and a ver-dict follows, and thus the rebate is secured.

It is apparent that if the schedule of rates provided for by the act and adopted and posted in accordance with its provisions is not to be accepted as the basis for determining whether charges made are reasonable, then the carriers and shippers alike are left without any certain or reliable guide for determining the rate that should be de-manded and paid for given shipments. Under such a system, uni-formity and equality in rates cannot be secured, and the main object of the act, to wit, the prevention of discrimination by way of secret rebates and the like, which it is sought to secure by the provisions requiring the adoption and making public of a fixed schedule of rates and the requirement that the carrier shall not deviate therefrom, will be defeated, because, on the theory of the plaintiff, the shipper is not bound to pay that rate unless a jury decides that it is reasonable, and, if the shipper is not bound to pay it, the carrier is not entitled to demand, receive, and retain it. If the contention of plaintiff be sound, every schedule of rates posted by carriers under the provisions of the act should have attached thereto the memorandum: "Subject to change in accordance with the verdicts of juries which may here-after be rendered." If the theory advanced by the plaintiff in sup-port of the demurrer is sustained, to wit, that in suits of this nature, based upon the interstate commerce act, and wherein it is sought to determine the reasonable rate chargeable for a given number of shipments of freight, the schedule of rates established by the car-rier, and posted as required by the act, is to be laid aside, and the jury must undertake to decide as best they may what the reasonable rate in fact was, the result must be that inequalities in rates exacted will be created, and discriminations in effect will be created and en-forced; thus violating the more important and valuable provisions of the act. The statute does not confer upon courts and juries the power or the duty to prescribe in advance what rates may be char-ged. That duty the act does place upon the carrier; and when the carrier, in obedience to the statute, has established and posted a schedule of rates, it becomes binding on the carrier, who cannot deviate from it without being guilty of a misdemeanor, and becoming subject to the penalties provided by section 10 of the act; and yet the theory of the plaintiff is that when the defendant company made its charges for the shipments described in the several counts of the petition it ought to have deviated from the previously posted sched-

ule rates, and because it did not do so it is now liable in damages to the plaintiff. It is the consideration of these and like difficulties which would be created if the contention of plaintiff be sustained, and which would result in the practical defeat of the main purpose of the interstate commerce act, to wit, the securing uniform and equal rates for like services, and the prevention of unjust discriminations, which leads me to the conclusion that it is the intent of the interstate commerce act to make the schedule of rates required to be adopted, printed, and posted by the carrier the basis for determining whether a given rate exacted from a shipper is or is not unreasonable under the provisions of the act, and I therefore hold that the demurrer to the answer is not well taken, and must be overruled.