UNITED STATES v. PACIFIC & A. RY. & NAV. CO.

(First Division. Juneau. April 29, 1912.)

No. 840B.

1. TERRITORIES (§ 18*)—COMMERCE—INTERSTATE.

Alaska is one of the organized territories of the United States, and the Interstate Commerce laws are in force there.

[Ed. Note.—For other cases, see Territories, Cent. Dig. §§ 14, 15; Dec. Dig. § 18.*]

2. COMMERCE (§ 89*)—COURTS—JURISDICTION—INTERSTATE COMMERCE COMMISSION.

This court has no jurisdiction under an indictment charging a common carrier with charging and collecting excessive rates

―――――――――

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

for carriage of property. The only forum authorized by law to determine the reasonableness or unreasonableness of freight rates is the Interstate Commerce Commission.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*]

3. CRIMINAL LAW (§ 97*)—JURISDICTION—COMMERCE—CARRIERS.

The indictment charges the defendant with exacting excessive rates for carrying freight from Skagway, Alaska, to Dawson, in Yukon territory, across British Columbia territory. On demurrer, *held* that, since the indictment does not charge that the exaction was wholly in American territory, the court is without jurisdiction, and the demurrer is sustained.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 177–189, 191; Dec. Dig. § 97.*]

This is a criminal action against the defendant for charging unjust and unreasonable rates for services in the transportation of passengers and freight from Skagway, Alaska, to Dawson, Yukon territory, and way points.

The indictment charges that the defendant is a corporation organized under the laws of the state of West Virginia, and owns and operates a railroad from tide water at Skagway, in the district of Alaska, to the summit of White Pass, a distance of approximately 20 miles, to the boundary line between Alaska and British Columbia; that said railroad connects at that point with another railroad owned by the British Columbia Yukon Railway, a corporation organized under the laws of the province of British Columbia, Dominion of Canada, and that the latter railroad extends from the summit of White Pass to the east shore of Lake Bennett and the boundary line between British Columbia and the Yukon territory, Canada, a distance of approximately 20 miles; that said last-mentioned railroad connects with another railroad owned and operated by the British Yukon Railroad Company, a corporation organized under the laws of the Dominion of Canada; that said last-mentioned railroad extends from said point on the east shore of Lake Bennett to White Horse on the headwaters of the Yukon river in the Yukon territory of Canada; that during all of the time mentioned in the indictment there was a line of steamboats plying on the said Yukon river

between said White Horse and Dawson, in the Yukon district, which line of steamships was owned and operated by the Yukon Navigation Company, a corporation; that said four corporations last above mentioned and the stocks and bonds of the same were owned and controlled by the same persons or individuals; that said three lines of railroad and said line of steamboats were under one and the same management and operated as one continuous line of common carriers of property in interstate commerce between said towns of Skagway and Dawson and way points under the name and style of White Pass & Yukon Route, and as such were used and operated to transport and carry freight and passengers for hire between said points, and that, during all of the time herein mentioned, said railroad company had and exercised sole and exclusive monopoly in the said transportation business between said Skagway and Dawson; that on or about the 24th day of July, 1910, at Skagway, the Puget Sound Flouring Mills Company shipped to J. E. Lilly, residing at said Dawson, ten tons of flour, and that on the day last mentioned the said railroad company accepted and received from the said Puget Sound Flouring Mills Company the said ten tons of flour at Skagway for transportation and carriage, and transported and carried the same, over its said line from Skagway to Dawson, and that the said railroad company charged, demanded, exacted, collected, and received for said transportation for said ten tons of flour from Skagway to Dawson the sum of $53 per ton, which said charge for such transportation and carriage of said flour was duly paid, and that said charge was then and there unjustly and unreasonably high, and was then and there unlawfully, wrongfully, knowingly, willfully, and maliciously made by said Pacific & Arctic Railway & Navigation Company, and that a just and reasonable rate and charge for said service was then and there the sum of $25 per ton, and any greater charge or rate than said charge of $25 per ton was then and there unjustly and unreasonably high.

To the indictment the defendant interposed a motion to quash. The portions of said motion necessary to consider in

this opinion are as follows: (1) That the facts stated in said indictment do not constitute a crime. (2) That said indictment does not charge or allege facts against the defendant sufficient to constitute an offense for the violation of any law by the defendant. (3) That said indictment fails to sufficiently show that the crime charged was committed within the jurisdiction of said court. (4) That said indictment does not allege any offense of which this court has jurisdiction.

At the time of the oral hearing on this motion, as well as the hearing of the motions in causes numbers 834B, 835B, 836B, 837B, and 841B, it was agreed by and between counsel representing the various defendants charged in said indictment and the government that substantially the same questions raised by the various motions would be tendered by demurrer if the court would determine that such questions should be presented in that manner and not by motion, and that the court should and did hear argument as though both the motion and the demurrers were before the court for consideration. It is the judgment of the court that demurrer is the proper remedy to reach the questions involved, and, pursuant to the arrangement between counsel at the hearing, the court will proceed to determine the questions involved as though the objections raised were presented by demurrer.

John Rustgard, Dist. Atty., of Juneau, for the United States.

Bogle, Graves, Merritt & Bogle, of Seattle, and Royal A. Gunnison, of Juneau, for defendant.

LYONS, District Judge. There are two serious questions raised by the demurrers: (1) Do the facts charged in the indictment constitute a crime; and (2) if the indictment is sufficient in that respect, has the court jurisdiction over the subject-matter of the indictment?

The defendant contends that the Interstate Commerce Law and its amendments do not apply to the district of Alaska, but, that even if they are applicable to this territory, then it becomes the duty of the Interstate Commerce Commission in the first instance to determine what are just and reasonable rates, and that a court is without jurisdiction, either in a crim-

inal or a civil proceeding, to determine what are just and reasonable rates until the Commission has first passed upon the question and determined ·what is a just and reasonable rate in a given case. The defendant further contends that the schedule of rates which are filed with the Interstate Commerce Commission are presumptively reasonable, and the only forum provided by law for testing the question as to their reasonableness or the unreasonableness is the Interstate Commerce Commission; that, the Interstate Commerce Commission having held that Alaska is not within its jurisdiction, there was no opportunity for the defendant to file its schedule of rates with the Commission. The defendant further contends that the demurrer to this indictment must be sustained for the additional reason that the freight charges complained of were for transporting merchandise partly through American territory and partly through Canadian territory, and that the indictment does not affirmatively show that the defendant owned and controlled the other railroad companies and the steamship company with which it connected in the transportation of the property referred to in the indictment from Skagway to Dawson.

The Interstate Commerce Commission, in the matter of jurisdiction over rail and water carriers operating in Alaska (19 Interst. Com. Com'n. R. 81), held that it had no jurisdiction over common carriers in Alaska, for the reason that the Interstate Commerce Act does not apply to and is not in operation in the district of Alaska. The decision of the Commission was announced June 6, 1910. In July, 1910, a proceeding was instituted in the Supreme Court of the District of Columbia asking for the issuance of a writ of mandamus to require the Commission to execute and enforce the Interstate Commerce Act in the territory of Alaska. On January 6, 1911, that proceeding was dismissed by the Supreme Court of the District of Columbia, but on appeal to the Court of Appeals of the ·District of Columbia the ruling of the Supreme Court of the District was reversed, and the cause remanded, with directions to issue a pre-emptory writ of mandamus directed to the Interstate Commerce Commission requiring it to take juris-

diction of the cause. The Commission then prosecuted a writ of error to the Supreme Court of the United States, where the matter is now pending. In view of the ruling in that case, as well as the ruling in the case of Nagle v. United States, 191 Fed. 141, 111 C. C. A. 621, wherein the Circuit Court of Appeals for the Ninth Circuit held that Alaska was an organized territory within the meaning of section 1891 of the Revised Statutes of the United States, which provides that the Constitution and laws of the United States not locally inapplicable are, by the force of such section, extended to all the organized territories; the Interstate Commerce Act as well as all of the amendments thereto must be extended to and apply in Alaska unless the act of Congress of June 18, 1910 (36 Stat. 539, c. 309), in effect excepts Alaska from the application of the act and its amendments. Counsel for the defendant contend that Congress, having passed the act of June, 1910, subsequent to the ruling of the Interstate Commerce Commission, in which the latter held that it was without jurisdiction in Alaska, accepted that ruling by its failure to specifically make the act of 1910 apply to Alaska, so far as common carriers by rail and by water are concerned, and that such an omission from the act of June 18, 1910, indicates a legislative construction by Congress to the effect that it was not intended that the Interstate Commerce Act should apply to Alaska. However, when it is considered that the bill which resulted in the act of 1910 was introduced in Congress long before the ruling by the Interstate Commerce Commission, heretofore referred to, and the further fact that the ruling of the Commission to the effect that it was without jurisdiction in Alaska was made only a few days before the passage of the act of 1910, and when it is obviously doubtful whether or not Congress was aware of such a ruling at the time of the passage of the act of June, 1910, the contention that such act is a legislative construction of the Interstate Commerce Act and its amendments in harmony with the ruling of the Interstate Commerce Commission loses most of its force, particularly in the light of the judicial construction of the act by the appellate court for the District of Columbia and the

ruling in the Nagle Case. The court, therefore, holds that the Interstate Commerce Act, together with all of its amendments, applies in the district of Alaska, and the Interstate Commerce Commission has jurisdiction over all common carriers in Alaska which are subject to such act and its amendments.

It is the duty of all common carriers subject to the act to regulate commerce to file with the Interstate Commerce Commission its schedule of rates and fares, but, since the Interstate Commerce Commission refused to take jurisdiction over carriers in the territory of Alaska, it became impossible for carriers to observe that mandate of the statute. However, this is not a prosecution for failure to file such schedule of rates, and the case must be considered as though that provision of the statute had been complied with by the defendant.

Has a court jurisdiction to determine the reasonableness or unreasonableness of rates prior to a consideration of the same by the Interstate Commerce Commission and its determination as to whether such rates are reasonable?

In re Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., reported in 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075, the court said:

"The Interstate Commerce Act was intended to afford an effective and comprehensive means for redressing wrongs resulting from unjust discriminations and undue preference, and to that end placed upon carriers the duty of publishing schedules of reasonable and uniform rates; and, consistent with the provisions of that law, a shipper cannot maintain an action at common law in a state court for excessive and unreasonable freight rates exacted on interstate shipments, where the rates charged were those which had been fixed by the carrier according to the act and had not been found to be unreasonable by the Interstate Commerce Commission."

On page 436 of 204 U. S., on page 354 of 27 Sup. Ct. (51 L. Ed. 553, 9 Ann. Cas. 1075), the court further said:

"The Commission was endowed with plenary administrative power to supervise the conduct of carriers, to investigate their affairs, their accounts, and their methods of dealing, and generally to enforce the provisions of the act: To that end it was made the duty of district attorneys of the United States, under the direction of the Attorney General, to prosecute proceedings commenced by the Commission to enforce compliance with the act. The act specifically provided that whenever any common carrier, subject to its provisions, 'shall do,

cause * * * or permit to be done any act, matter or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act. * * * ' Power was conferred upon the Commission to hear complaints concerning violations of the act, to investigate the same, and, if the claims were well founded, to direct not only the making of reparation to the injured persons but to order the carrier to desist from such violation in the future. In the event of the failure of the carrier to obey the order of the Commission, that body or the party in whose favor an award of reparation was made was empowered to compel compliance by invoking the authority of the courts of the United States in the manner pointed out in the statute; prima facie effect in such courts being given to the findings of fact made by the Commission."

### The court further used the following language:

"When the general scope of the act is enlightened by the considerations just stated, it becomes manifest that there is not only a relation, but an indissoluble unity, between the provision for the establishment and maintenance of rates until corrected in accordance with the statute and the prohibitions against preferences and discrimination. This follows, because, unless the requirement of a uniform standard of rates be complied with, it would result that violations of the statute as to preferences and discrimination would inevitably follow. This is clearly so, for if it be that the standard of rates fixed in the mode provided by the statute could be treated on the complaint of shipper by a court and jury as unreasonable, without reference to prior action by the Commission, finding the established rate to be unreasonable and ordering the carrier to desist in the future from violating the act, it would come to pass that a shipper might obtain relief upon the basis that the established rate was unreasonable, in the opinion of a court and jury, and thus such shipper would receive a preference or discrimination not enjoyed by those against whom the schedule of rates was continued to be enforced. This can only be met by the suggestion that the judgment of a court, when based upon a complaint made by a shipper without previous action by the Commission, would give rise to a change of the schedule rate, and thus cause the new rate resulting from the action of the court to be applicable in future as to all. This suggestion, however, is manifestly without merit, and only serves to illustrate the absolute destruction of the act and the remedial provisions which it created which would arise from a recognition of the right asserted. For if, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that, unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the

various courts called upon to consider the subject as an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirements as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the Commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed, no reason can be perceived for the enactment of the provisions endowing the administrative tribunal, which the act created, with power, on due proof, not only to award reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old or the filing of a new schedule, conformable to the action of the Commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the Commission in the premises. This must be, because, if the power existed in both courts and the Commission to originally hear complaints on this subject, there might be a divergence between the action of the Commission and the decision of a court. In other words, the established schedule might be found reasonable by the Commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible."

See, also, Van Patten v. Chicago, M. & St. P. Ry. Co. (C. C.) 81 Fed. 545.

Counsel for the government concedes that the cases last cited sustain the doctrine that no action can be maintained by a shipper against a carrier for excess rates, providing such rates are in accordance with the schedule of rates filed with the commission, until the rates have been determined to be excessive and unreasonable by the Interstate Commerce Commission and an order has been entered by that Commission directing the railroad company to refund the excess rates, but contends that a criminal prosecution will lie against a carrier for exacting unjust and unreasonable rates without any prior determination that such rates are unreasonable by the Commission. The court feels compelled to dissent from the view taken by counsel for the government for the reason that the only form authorized by law to determine the reasonableness or

unreasonableness of freight rates is the Interstate Commerce Commission. If a court in a civil action is without jurisdiction to consider the reasonableness or unreasonableness of a rate until the same is passed upon by the Interstate Commerce Commission, how can a court determine the reasonableness or unreasonableness of the same rate in a criminal prosecution? Before the jury would be warranted in finding the defendant guilty, it would be compelled to say that the rate was an unjust and an unreasonable rate. As held by the Supreme Court in the Abilene Case, Congress has withdrawn from the courts the power and jurisdiction of determining in the first instance the reasonableness or unreasonableness of rates. One of the objects of Congress in the enactment of the Interstate Commerce Law was to procure equality among shippers and to prevent discriminations, and the best means of effecting such purposes was to create one forum that would be endowed with the exclusive, original jurisdiction of passing upon the reasonableness or unreasonableness of freight rates. The very purposes of the act would be defeated if courts were to take jurisdiction of such matters in the first instance. The evils resulting from the adoption of such a construction of the statute as was contended for by the shipper in the Abilene Case are clearly and forcibly portrayed in the opinion of the Supreme Court in that case, and the same reasoning would seem to apply more forcibly, if possible, in a criminal prosecution. For a jury to-day might find a rate to be unjust and unreasonable, and consequently render a verdict of guilty, and the next day the Interstate Commerce Commission might be called upon to determine the reasonableness or unreasonableness of the specific rate passed upon by the jury, and the Commission might determine the rate to be reasonable. A conviction would therefore have been had without a violation of the law. The position of the government in that respect is clearly untenable. In Re Tozer v. United States (C. C.) 52 Fed. 917, the court, among other things said:

"The 'undue preferences' clause in the Interstate Commerce Act is indefinite and uncertain, and a conviction for its violation cannot be sustained where the criminality of the act is made to depend on whether the jury think a preference reasonable or unreasonable."

Owing to the view entertained by the court with reference to the sufficiency of the indictment as to whether or not sufficient facts are stated to constitute a crime, it would not be necessary for the court to discuss the other question involved, were it not for the fact that the same question is raised in some of the other indictments to which reference has heretofore been made.

The indictment charges that the defendant company operated a railroad from Skagway to the summit of White Pass, on the boundary line between Alaska and the Dominion of Canada; that it connected with another railroad owned by another railroad company which extended from the summit of White Pass to the east shore of Lake Bennett; that the second railroad connects with a third railroad owned by a different corporation which extended from the east shore of Lake Bennett to White Horse, which latter road connects with a line of steamships owned by the British Yukon Navigation Company, a corporation, plying between White Horse and Dawson, in the Yukon territory; that said four corporations last above mentioned and the stocks and bonds of the same were owned and controlled by the same persons and individuals, and said last three lines of railroad and said line of steamboats were under one and the same management and operated as one continuous line of common carriers of property in interstate commerce between said towns of Skagway and Dawson and way points under the name and style of White Pass & Yukon Route. The indictment fails to charge that the defendant company owned or controlled the other railroads with which it connected or the steamship company. It is true it does charge that the stocks and bonds of the said four corporations were owned and controlled by the same persons and individuals, and that said three lines of railroads and the said line of steamboats were under one and the same management and operated as one continuous line of common carriers, but the stocks and bonds of these four companies might have been owned by the same people and all of the connecting lines might be under the same management; yet these two facts would not necessarily indicate that the defendant company

either controlled, owned, or directed the other. two railroads or the steamship line.  A., B., C., and D. may own all the stock and bonds of all the four corporations, and the four corporations may be under their management, but it may be that A. owns the majority of stocks and bonds of the defendant company and owns very little or at least not sufficient to give him any control over the other corporations; hence he would be without power to compel the other railroad corporations to do his bidding with reference to rates, even were he so disposed.  The indictment fails to allege that an unjust or unreasonable rate was charged by the defendant company from Skagway to the summit of White Pass, or within territory over which this court has jurisdiction.  The statement of facts charged in an indictment must be so definite and comprehensive which, if sustained by proof, would force the conclusion that the law had been violated; but such is not true of the present indictment.  There is no allegation that unjust or unreasonable freight rates were charged within American territory.  The facts stated in the indictment may be true (that is, that an unjust and unreasonable rate was charged the shipper between Skagway and Dawson); it may also be true that the excessive portion of said through rate was all for transportation service rendered in Canadian territory, to wit, from the boundary line to Dawson.  It is not alleged in the indictment that the defendant violated any of the Canadian laws or charged such a rate as is denounced by the Canadian statutes.  It must be assumed, therefore, that the defendant violated no law of Canada, and, while it is true that, if a Canadian law were violated, such violation should be considered by a Canadian court, it is certainly also true that our laws are bounded in their extent and application by the boundary line of our territory, and it seems difficult to conceive of a violation of the Interstate Commerce Act without foreign territory.

"The provisions of the act to regulate commerce apply to foreign as well as domestic carriers, engaged in the transportation of passengers or property, for a continuous carriage or shipment, from a place in the United States to a place in an adjacent foreign country

4 A.R.—34

over that portion of the haul within the United States." Barnes on Interstate Transportation, § 42.

"The Commission has ruled that a foreign railroad corporation, such as the Grand Trunk Railroad Company, carrying on its traffic between the United States and Canada, was subject as to its business in the United States to the same rules and conditions as domestic carriers. * * * But, while a corporation engaged in interstate traffic in the states is subject to the act as to such traffic, the jurisdiction of the commission is necessarily limited to the United States and does not extend to a question of alleged local discrimination in a foreign country as Canada. * * * The control of international transportation between Canada and the United States by a joint commission is now (1911) the subject of conference between these countries. A treaty is to be proposed, and the necessary legislation passed in both countries." Judson on Interstate Commerce, § 146; American Banana Co. v. United States Fruit Co., 213 U. S. 347, 29 Sup. Ct. 511, 53 L. Ed. 826, 16 Ann. Cas. 1047; United States v. Knight, 3 Interst. Com. Com'n R. 801.

For the reasons herein assigned, the demurrer should be sustained, and the indictment dismissed; and it is so ordered.