[No. 3666.    Aug. 14, 1931.]

SAN JUAN COAL & COKE CO. v. SANTA FE, S. J. & N. RY. CO. et al.

[2 Pac. (2d) 305.]

See, also, 291 P. 920.

Reed Holloman, of Santa Fe, for plaintiff.

W. C. Reid, of Albuquerque, for defendants.

OPINION OF THE COURT

WATSON, J.

San Juan Coal & Coke Company, the petitioner, operates coal mines at La Ventana. Santa Fe, San Juan & Northern Railway Company, hereinafter referred to as the San Juan Road, is a common carrier, owning and operating a 31-mile line from Tilden, two miles north of La Ventana, to San Ysidro. Santa Fe Northwestern Railway Company, hereinafter referred to as the Northwestern Road, is not, as we understand, a common carrier. It was built and is operated as a timber road. It extends from Bernalillo, its junction with the Atchison, Topeka & Santa Fe Railway Company, hereinafter referred to as the Santa Fe, through San Ysidro, to points beyond. The San Juan Road was built with the assistance of the Santa Fe; the latter still being the creditor of the former, for rails, ties, etc., furnished to the extent of $221,000. It was originally operated as a mining facility, so called. It had financial troubles and was sold in a receivership proceeding. Reorganized, and having acquired trackage rights from the Northwestern, from San Ysidro to Bernalillo, it applied for and obtained from the Interstate Commerce Commission, in 1929, a certificate of convenience and necessity to operate as a common carrier from Bernalillo to Tilden.

In a recent case wherein the present petitioner demanded better facilities from the San Juan (San Juan Coal & Coke Co. v. Santa Fe, San Juan & Northern Railway Co., 35 N. M. 336, 298 P. 663,) we commented on the conditions and the problems in general, arising out of the allied, and still conflicting, interests of these two parties in the present case. The same situation in reflected in this record.

When the San Juan Road commenced business as a common carrier, these defendants published a joint tariff. It was immediately attacked by the petition now before us as unreasonable and discriminatory. It was particularly challenged on the grounds that, though La Ventana, and the Waldo group of mines are approximately the same distance from points on the Santa Fe, the Waldo group enjoyed an advantage of 65 cents to Albuquerque, of 47 cents to the Pecos Valley, and substantial advantages to other points; and that, though the haul from Gallup is 70 miles longer, the latter enjoyed the same rates as those given to La Ventana to points south and east of Albuquerque. The prayer was that the rates from Waldo be established as the rates from La Ventana.

As matters stood when the petition was filed, rates to Albuquerque, the natural and most important market for La Ventana coal, were: From Raton-Dawson, 229 miles, $3.25; from Gallup, 160 miles, $2.85; from the Waldo group, 48 miles, $1.85; from La Ventana, 69 miles, $2.50. Since then, by order of the commission, enforced by this court in John Becker Co. v. A. T. & S. F. Ry. Co., 35 N. M. 187, 291 P. 919, these competing rates have been reduced. They are now: Raton-Dawson, $2.70; Gallup, $2.15; and Waldo, $1.12. The order now under review fixes the rate from La Ventana to Albuquerque at $1.35. The rates mentioned are for lump coal. In all cases lower rates are fixed for nut, and still lower for slack and pea.

We refused to enforce the first order made on this petition; the majority finding it unreasonable as to the rates to Bernalillo, and not being satisfied of its reasonableness as a whole. San Juan Coal & Coke Co. v. Santa Fe, San Juan & Northern Ry. Co. et al., 35 N. M. 189, 291 P. 920. The proceeding was remanded to the commission. Further hearing was there had. The new order is now here, on removal by the carriers.

The unreasonableness and discriminatory character of the existing rates was well shown in the first record. It was the reasonableness of the rates by which the commission had replaced them, that this court doubted. It

appeared that the existing rates imposed hardship not alone on the La Ventana shippers, but on the San Juan Road as well. The latter was in the position of having admitted that, if it was to continue to exist, it must have joint rates enabling its patrons to compete with the Waldo group of mines. But the hardship upon the San Juan Road was not limited to the high joint rates. It appeared that, in the division of those rates with the Santa Fe, by contract between the two roads, but 90 cents per ton was allowed the San Juan Road on lump and nut, and but 75 cents per ton on slack. A great part of that record resulted from an airing of that grievance. It was in that connection that the testimony was given, considered by the majority as fatal to the then order, that the actual costs of this service to the San Juan Road were $1.15 and 90 cents, respectively.

It had been the position of all parties, at the hearing before the commission, and originally before this court, that this grievance of the San Juan against the Santa Fe was irremediable by any state authority, because of a lack of power in the commission to prescribe a division of rates. On hearing on that record, this court became unanimously convinced of the existence of the power. The writer believed that the then record justified an enforcement of the order, leaving it to the aggrieved road to institute a proper proceeding for redress. But the majority was of the opinion that "* * * the present controversy cannot be fairly and justly determined without giving to the question of division its proper consideration. * * *" So, the proceeding was remanded.

At the second hearing the commission called attention to the matter of division of rates, and plainly announced the view that it was bound to inquire into and to effect it. All of the carriers again denied the power of the commission to fix joint rates or to make divisions. They declined to go into the matter, declined to offer evidence which would furnish the basis for a division, and insisted that the complainant, interested solely in the reasonableness of the rates as a whole, could not do so.

The first two points now urged, in resisting enforcement of the present order, are that it fails to comply with the mandate of this court and that the commission has exceeded its powers and jurisdiction. We shall consider these questions in inverse order.

■ Has the commission the power to prescribe division of joint rates? In the former opinion we indicated a reliance upon the holding and reasoning in Backus-Brooks Co. v. Northern Pacific Railway Co. (C. C. A.) 21 F.(2d) 4. The carriers urge that the case is distinguishable, because the result is based upon a statute of Minnesota which expressly confers upon its commission the power to make joint rates; a power which, they contend, our commission does not possess. The proposition laid down in the case cited, and which had our approval, is that, given the power to establish joint rates, the power to specify the division of them follows as a necessary incident to it. Counsel, in oral argument, admit the force of this.

So, the contention really is that our commission has no power to establish joint through rates. The argument amounts merely to this: That the Constitution, which created the commission and specifically defined its powers, gave it no such power in express terms, and that the language of the grant must be strictly construed.

The Constitution (article 11, § 7) provides:

"The commission shall have power and be charged with the duty of fixing, determining, supervising, regulating and controlling all charges and rates of railway, express, telegraph, telephone, sleeping-car, and other transportation and transmission companies and common carriers within the state. * * * The commission shall have power to change or alter such rates. * * *"

True, there is no mention of joint through rates. But the term "all charges and rates" is very broad. Is it to be limited by the strict construction which appellants invoke?

If the commission were a creature of the Legislature, we should construe its powers with some strictness. Such powers as the Legislature had not conferred or delegated, it would be deemed to have reserved. Even so, the language of the grant is here so all-inclusive that good reason for limiting it has not occurred to us.

But this is not a legislative grant. It is a delegation of power and duty by the Constitution. The power to fix rates is an attribute of sovereignty. The people, in framing their fundamental law, considered where they would place it. It is legislative in its nature, and, if the people had not spoken, rate making would have devolved upon the Legislature as one of its natural and inherent concerns. But they did speak. It is clear to us that they intended the corporation commission to have all the power and the Legislature to have none of it. To suppose an intent that the corporation commission should make ordinary rates and that the Legislature should make joint through rates would be absurd. If the question be which, the corporation commission or the Legislature, has the power here in question, the grant to the former will satisfy the strictest rule of construction.

The power of a state, by some appropriate agency, to fix joint through rates, we do not understand appellants to question. It has been too long exercised and recognized. Of course, the people did not reserve this power to themselves. If they did not abandon it—and it is not claimed and we do not suppose that they did—they delegated it to the commission.

We consider the rate-making power of the commission to be plenary, except as restricted by those principles of constitutional law which would have limited its exercise if it had been intrusted to the Legislature.

Counsel also contend that certain provisions of statute law place this order beyond the power of the commission. Reference is made to 1929 Comp. §§ 116-202, Eleventh, 116-708 and 116-409. The two sections first mentioned were enacted in 1878. They provide, respectively, that a railroad company shall have the power to "regulate the time and manner in which passengers and property shall be transported over its roads, and the tolls or compensation to be paid therefor," and that, until surplus earnings shall amount to 10 per cent. of the cost of construction and equipment, certain maximum "charges for fares and freightages" shall not be reduced. These provisions require slight consideration. With the consti-

tutional conference of plenary rate-making powers upon the commission, they ceased to operate.

Section 116-409 was enacted in 1921, and provides that:

"The owner or owners of any line of railroad, not exceeding 60 miles in length, in the state of New Mexico, which has been or shall be constructed primarily for the purpose of carrying coal, lumber or the products of some other particular industry, may enter into private contracts for the carriage of persons or freight over such line of railroad without thereby becoming liable to control as common carriers or becoming subject to the obligations and duties of common carriers."

Passing the constitutionality of this section, we hold the view that it is not applicable. The San Juan Road holds a certificate of convenience and necessity from the Interstate Commerce Commission, and is clearly operating as a common carrier over its own line from La Ventana to San Ysidro, 29 miles, and from that point to Bernalillo, 24 miles, under its trackage rights. Counsel suggest that, though to be deemed a common carrier with respect to interstate commerce, it is not such in its domestic business. We see no logic or merit in the contention and apprehend that such holding would serve only to complicate the already complicated situations resulting from the divided jurisdiction over commerce.

We may grant that the Northwestern is not a common carrier. But it has no direct interest in the present schedule of rates. Such interest as it has results from the fact that it has granted trackage rights to the San Juan.

Having determined that it was not beyond the jurisdiction of the commission to fix any rates or to fix joint through rates in this case, we take up the contention that the order should not be enforced because made in disregard of the mandate of this court.

The order failed to prescribe any division of the joint rates. We have already stated the reason. Under the circumstances, any concern of the carriers that proper respect and obedience be shown to the mandate of this court does not greatly impress us. We have no wish to force unwilling carriers to litigate the distribution of joint tariffs. We accept their decision not to do so. If

the San Juan will not accept the good offices of the commission to obtain for it a fair share of the compensation allowed, it cannot longer complain that the rates are not compensatory as to it. Nor can the Santa Fe be permitted to avoid a rate schedule, reasonable as to it, by making a cat's paw of the San Juan. The question is not whether 90 cents is reasonable for the initial 53-miles haul from La Ventana to Bernalillo, or whether 45 cents is reasonable to complete the haul to Albuquerque. It is whether $1.35 is reasonable for the whole service.

It is also pointed out that the schedule now ordered into effect contains no rate from La Ventana to Bernalillo. Counsel refer to it as a "base rate," indispensable in the fixing of all through rates. To an extent, that would be true in carrying out our purpose to fix rates upon consideration, among other factors, of the costs of service to each carrier. But since the reasonableness of the rates is to be determined in this case without regard to apportionment of compensation, we do not see that a rate to Bernalillo is more important than any other, or that the failure to include such a rate in the prescrbed schedule is a matter of consequence.

We come now to the contention that the rates prescribed are unreasonably low and confiscatory. In the main, the evidence supporting these rates consists in a comparison with other rates on the same commodity for comparable distances. We are of opinion that it fairly meets this test. Previous decisions in rate cases have developed the rule that the commission's order or findings will not be disturbed if supported by satisfactory and substantial evidence. In re Coal Rates in New Mexico, 23 N. M. 704, 171 P. 506; Kinney v. New Mexico Midland Railway Co., 28 N. M. 451, 214 P. 754; Artesia Alfalfa Growers Association v. A. T., & S. F. Ry. Co., 33 N. M. 468, 270 P. 776; Gilliland Oil Co. v. A., T. & S. F. Ry. Co., 33 N. M. 638, 275 P. 93, 94; John Becker Co. v. A., T. & S. F. Ry. Co., 35 N. M. 187, 291 P. 919. We have held that the complaining shipper may make his prima facie case by such comparisons. Gilliland Oil Co. v. A., T. & S. F. Ry. Co., supra. We have also warned that evidence of differences in conditions properly enter-

ing into the rate making problem, offered to rebut such prima facie case, should give us "data by which we may measure the difference in these respects" and should include "evidence, expert or otherwise, by which we may determine how far these matters enter into the problem." Gilliland Oil Co. v. A., T. & S. F. Ry. Co., supra.

There is no data whatever on which to base the claim that the rates are confiscatory or noncompensatory. Counsel still rely on the evidence adverted to in our former opinion, that actual cost of hauling lump and nut from La Ventana to Bernalillo is $1.15 per ton. But other testimony in the present record, elicited from carrier officials, would indicate that such actual or out of pocket cost is less than 45 cents. But, even if that cost be $1.15, it can avail nothing in this case. We are not concerned with a rate to Bernalillo. We are considering only joint through rates. There is nothing to indicate that they will be noncompensatory as a whole.

The carriers claim that rates recently established by the commission and enforced by this court in John Becker Co. v. A. T. & S. F. Ry. Co., supra, from Gallup, Raton-Dawson, and the Waldo group, yield an average of 11.6 mills per ton mile, and that the rates here in question will produce an average of but 9.3 mills. The comparison means little to us. The former average is computed from three origins to three destinations, nine rates in all, for an average haul of 154 miles, the lowest being 48 and the highest 249. The La Ventana average is computed from one origin to 29 destinations, on distances averaging 300 miles, 16 of the distances being 300 miles or more and 3 being over 500 miles. We note in all schedules a progressive lowering of the ton mile yield with the increase of the distance. The rates fixed for comparable distances do not seem out of harmony. Interstate rates from the Walsen district of Colorado to Roswell and Clovis are cited. They seem to be substantially higher than those here prescribed for comparable distances. However, we are not, by this single instance, persuaded that enforcement of the order should be refused. In Holmes & Hallowell Co. v. Great N. R. Co., 69 I. C. C. 11, the Interstate Commerce Commission prescribed certain rates on coal. That sched-

ule has been employed by the corporation commission, in its recent rate cases, as a basis or point of departure; subject to variation as differences are shown in respect to any factor properly entering into the problem. The commission here reports, and the carriers do not deny, that the rates here in question are slightly higher than the "Holmes & Hallowell scale."

It is objected that the rate differentials in favor of nut and slack coal are without justification. Such classification and differentials are not unusual. The rates voluntarily published by these carriers, here complained of, are lower for slack than for lump and nut and, to some destinations, lower for nut than for lump. The same is true of the schedule offered by the carriers at the rehearing, for adoption by the commission. The testimony relied on by the majority of this court in remanding the proceeding, was that the actual cost of carriage from La Ventana to Bernalillo, though $1.15 on lump and nut, was but 90 cents on slack and pea. Counsel admit that "for commercial reasons and to enable the industry to find a market," carriers may voluntarily make such differentials. We do not doubt the proprietory of such considerations when the commission is fixing rates. They say that there is no evidence in this record to justify it. We find it in the established rates from Gallup and the Waldo and Raton-Dawson groups, the competitors of La Ventana.

There is some evidence of difficult operating and other conditions on the San Juan Road. Such matters should have consideration. How they should be reflected in the resulting rates we have no means of knowing. That they are not properly reflected therein, we cannot say. We find the present order reasonable and lawful, under standards previously set. We find the evidence substantial and satisfactory as a prima facie case. We find that the attempted rebuttal fails. It does not meet the requirements heretofore stated and hereinbefore quoted.

In rate cases, carriers have invariably relied strongly on the proposition that their adversaries must sustain the burden of proving the reasonableness and lawfulness of rates fixed by the commission. Our former decisions

will be found considerably to limit the rule. Such limitations are necessary to our system of rate regulation. The problem is intricate. Many factors enter into it as to which only the carriers can be expected to make proof. Unless they co-operate, results must be more or less conjectural and unsatisfactory.

We realize that carriers have the right to resist the lowering of rates and that, so long as they are contending that existing rates are reasonable, it is difficult for them to enter freely into the problem of new rates. We appreciate the suggestion of the able counsel here appearing for the carriers, that the schedule here under consideration is more important as a standard for future schedules than in its immediate and direct consequences. It is true that the enforcement of an unreasonable order may, under the principles we follow, lead to the enforcement of others. But there is nothing necessarily permanent in what we do in these cases. There is always the possibility of a general review of all intrastate coal rates, to be participated in by all interested parties, to the end that all may harmonize and be reasonable. The necessity and practicability of such a proceeding is not for us to suggest.

The order of the commission will be enforced. The carriers will have twenty days within which to comply with it. It is so ordered.

SADLER and HUDSPETH, JJ., concur.

BICKLEY, C. J., and PARKER, J., did not participate.