224 P.2d 155

**STATE v. MOUNTAIN STATES
TEL. & TEL. CO.**

No. 5240.

Supreme Court of New Mexico.

Nov. 11, 1950.

Joe L. Martinez, Atty. Gen., Philip H. Dunleavy, Asst. Atty. Gen., James B. Cooney, Sp. Asst. Atty. Gen., M. W. Hamilton, City Atty., Santa Fe, Earl E. Hartley, City Atty., Clovis, J. V. Gallegos, City Atty., Tucumcari, James Cullender, City Atty., Roswell, for appellant.

Harry L. Bigbee, Santa Fe, Thomas M. Tierney and Akolt, Campbell, Turnquist & Shepherd, all of Denver, Colo., for appellee.

BRICE, Chief Justice.

This case is before us on removal from the New Mexico State Corporation Commission, which approved new and increased rates for telephone service throughout the State of New Mexico, made and published by appellee to become effective June 10, 1949.

The appellants have made a "Statement of the Facts," the parts of which we have included here are treated by the parties in their argument as correct. It will be unnecessary for a determination of the case to insert herein all of the tabulations appearing in this statement of facts. In some cases totals only will be used, and some will be eliminated. With this explanation, that part of the statement material to a decision is as follows:

"To sustain its position the Telephone Company first introduced evidence showing the growth and development of the company in the State of New Mexico since the war. Since V-J Day the company has added 30,942 phones, and as of June 30, 1949, there were 84,686 phones in service. During the first six months of the year 1949, there was a net gain of 6,720 telephones in service. The extent of the growth measured by the number of telephones is best understood when it is realized that in 1940 there were 33,511 phones in service in the state.

"Another substantial item has been the increase in the number of employees of the company. On December 31, 1940 there were 453 employees; on December 31, 1945 there were 744 and the total number was increased to 1261 as of December 31, 1948. The effect of this has been to increase the total payroll from $643,000 in 1940 to $2,-839,000 in 1948. In the first six months of 1949, salary and wages amounted to $1,-696,543. Stated another way, in 1940, forty-one cents from each dollar of revenue went for wages and in 1948 fifty-eight cents out of each dollar went for wages.

"The demand for telephone service has been so great in the past few years that the company has been unable to satisfy everyone. On December 31, 1948 there were 10,-638 unfilled applications, and on June 30, 1949, the unfilled applications had been reduced to 8,137. The company has taken care of the increased demand by loading its

present facilities to capacity and by the expenditure of a considerable amount of money.

"The Company estimates that during the years from 1946 through 1948 it has spent $9,548,404 in gross construction, resulting in an increase in their investment in the state of $8,432,433. This investment has resulted in 250 miles of power line, 1,960 miles of exchange wire on poles, 55,481 miles of exchange wire cable, 21,688 miles of rural service circuits, 68 switchboard positions, 11,390 terminal dial central office equipment, 7,835 lines of manual central office equipment, 9 new buildings or building additions, and 30,942 telephones. During the year 1949 the company contemplates spending $2,381,700 for additions costing $3,000 or more, and will spend approximately $1,550,000 in connection with the installations costing less than $3000. The principal expenditures will be $2,000 for right-of-way, $318,200 for land and buildings; $1,190,500 for central office equipment; $924,900 for exchange plant, such as conduit cable, poles and wires, and $300,000 for toll lines.

\* \* \* \* \* \*

"This situation can be remedied, according to the company, only by their ability to obtain the necessary capital to make the necessary additions. The service tendered by the company is in direct relation to its ability to raise funds. The present increase is not assurance that the company will be able to furnish all the telephone service required by the people of the state. As a result of the construction program in the state of New Mexico, the company has been forced to raise large sums of money. It claims that it has been handicapped in its attempts to raise funds through its inability to pay adequate dividends on its common stock as a result of poor earnings. \* \* \*

"In 1946 a bond issue was made by the telephone company at which time it paid 2.58% for its debt money. In 1948 another bond issue was made by the company at which time it had to pay 3.12% interest. The common stock of the Telephone Company, par value of 100, is selling at 94 bid, 99 asked. The $100 par stock of the parent corporation, American Telephone & Telegraph, was, on the day of the hearing, selling for $141 per share and paying a $9 dividend.

"In order to put the company in a sound financial condition, it was estimated that it would need an additional $890,000 of income to allow the company sufficient earnings to attract equity capital, and to build up its surplus. The alternative to the in-

crease in rates requested would be to continue the 'poor grade of service.'

"Between 1923 and 1947 there had been no increase in rates. In December of 1947, the company put into effect new rates which increased their gross revenue $306,000. The present increase amounts to $61,000 per month or $742,000 a year. To accomplish this rates were put into effect on June 10, 1949, which raised rates (except toll rates) approximately 50%.

"To justify the increases in rates the company presented evidence of the present value new of its properties in the State of New Mexico used for intrastate purposes. The explanation for using the present value theory was that the procedure had been followed by the Commission in the past. To show the present value, the company introduced into evidence Exhibit 16 which is an appraisal of the property as of December 31, 1948, and is as follows:

### Appellee's Exhibit No. 16

### Appraisal of Property as of December 31, 1948

| Class of Plant | Book Cost | Repro-duction Cost New | Percent Repro-duction Cost to Book Cost | Amount Existing Deprecia-tion |
|---|---|---|---|---|
| | (A) | (B) | (C) | (D) |
| Organization (here follows costs of specific items unnecessary to include here) | | | | |
| Total Telephone Plant In Service | 16,044,000 | 23,178,000 | 144% | 3,872,000 |
| Telephone plant under construction | 1,592,000 | 1,592,000 | | |
| Telephone plant acquisition adjustment | 20,000 | | | |
| Materials & supplies | 451,000 | 337,000 | | |
| Total Property | 18,414,000 | 25,528,000 | 139% | 3,872,000 |
| Less existing depreciation | | 3,872,000 | | |
| | | 21,656,000 | | |

"The above valuations cover property used for both intrastate and interstate business. It is estimated that the intrastate properties of the company amount to approximately 74.22 percent of the total valuation. There seems to be no dispute as to values.

"Column A represents the actual book cost of the property, a total value of $18,414,000. Column B shows what it would cost to reconstruct the plant today, giving it a total property value of $25,528,000, less observed depreciation of $3,872,000, a present value of $21,656,000. * * *

"On the basis of Exhibit 16, the company carried forward for the year 1949 what it determined to be its present value in the state and what its estimated earnings would be as far as intrastate operations were concerned. By projecting the data contained in Exhibit 16 into the year 1949, on the basis of five months' experience and the data supplied by the offices of the company primarily concerned, it estimated that the reproduction cost new of the property in the year 1949 would amount to $16,835,000. With this as a rate base, it was shown in Exhibit 17 that if the rates which were in effect on January 1, 1949 had remained in effect during the entire year, it would have net operating earnings of $450,000 giving the company a return of 2.67% on the present estimated value of the property. Exhibit 17 is as follows:

## Present Value Basis

Assuming January 1, 1949 rates had remained in effect during entire year.

| | |
|---|---:|
| Total operating Revenues | $5,114,000 |
| Total operating Expenses | 4,277,000 |
| | 837,000 |
| Total operating taxes | 411,000 |
| New operating income | 425,000 |
| Miscellaneous Income charges | 19,000 |
| Interest charged construction | 43,000 |
| New operating earnings | 450,000 |
| Present value | 16,835,000 |
| Per cent net operating earnings to present value, based on new reproduction | 2.67% |

"As distinguished from the reproduction cost new value of $16,835,000 for intrastate purposes, the total book investment estimated for the year 1949 is $14,795,000 made up of the following principal items:

| | |
|---|---:|
| Telephone Plant | $12,999,000 |
| Construction in Progress | 1,182,000 |
| Materials and supplies on hand | 344,000 |
| Cash working Capital | 270,000 |
| | $14,795,000 |

"On the basis of earnings of $450,000, the increase would give the company a return of 3.04% on its investment, or book costs.

"Exhibit 18 of the company is substantially the same as Exhibit 17 with slight modifications and is a projection of the appraisal contained in Exhibit 16 into the year 1949 and again gives the intrastate value of the company's property at $16,835,-000. If the rates which were put into effect on June 10, 1949 had been in effect for the entire year, the company would have earned $890,000, or 5.29% of its investment. On the basis of actual book value of $14,795,000 net operating earnings of $890,-000 would give the company a return of 6.02%. "Exhibit 19 gives the company again a present value of $16,835,000 for the year 1949. Assuming that the rates put into effect on June 10, 1949 continue in effect during the remainder of the year, the company would have earned a total of $689,000 or 4.09% on the present value of $16,835,000. On the basis of book cost of $14,795,000, earnings of $689,000 would have amounted to 4.66% of its investment.

"In none of the figures heretofore mentioned regarding Exhibits 17, 18 and 19 was there deducted from the original investment $2,687,000 in book depreciation. Reducing the book cost of the company's plant in New Mexico devoted to intrastate purposes, by $2,687,000 the company would have a net investment of $12,108,000.

"On the basis of a new investment in the state for intrastate purposes of $12,108,000, if the rates in effect on January 1, 1949 had continued in effect for the remainder of the year, the company would have earned $450,000 or 3.72% on its investment. If the rates in effect on June 10, 1949 had been in effect for the entire year, producing a revenue of $890,000 the company would have earned 5.69% on its net investment.

"If there were eliminated from the so-called investment of the company in the state those amounts which it charges to 'plant under construction' amounting to $1,-182,000, and there were eliminated $43,000 from the exhibits 17, 18 and 19 for 'interest charged coustruction,' we would have a further reduction in what might properly be deemed the investment of the company in the State of New Mexico for intrastate telephone use, which is summarized in State's Exhibit 2, as follows:

Results of Intrastate Operations, Year 1949

(1) Calculation of Return
  (a) Based on company's current cost new appraisal for 1949.

| | Earnings | Rate of Return |
|---|---|---|
| (1) Company Rate Base $16,835,000 | | |
| Exhibit No. 17, Jan. 1, 1949 rates | $450,000 | 2.67% |
| " " 18, June 10, " " entire year | 890,000 | 5.29% |

  (b) Company in their orig. cost rate base for 1949 (average investment) (Testified to by Mr. Spangler)

| | Earnings | Rate of Return |
|---|---|---|
| (1) Company rate base $14,795,000 (average investment) | | |
| Year 1949 on basis of Jan. 1, 1949 rates | 450,000 | 3.04% |
| " " " " " June 10, 1949 rates entire year | 890,000 | 6.01% |

  (c) Original Cost less Depreciation Reserve

| | Earnings | Rate of Return |
|---|---|---|
| (1) Using Company Average investment base less its proportionate part of the depreciation reserve 14,795,000 (less 74.22% x $3,620,532) $2,687,000 | 12,108,000 | |
| Year 1949 on basis of Jan. 1, 1949 rates | 450,000 | 3.72% |
| " " " " " June 10, 1949 rates entire year | 890,000 | 7.34% |

  (d) Based on Company's current cost new appraisal for 1949 but using Black & Vestch finding of accrued depreciation.

| | Earnings | Rate of Return |
|---|---|---|
| Rate base $16,285,000 | | |
| Year 1949 on basis of Jan. 1, 1949 rates | 450,000 | 2.76% |
| " " " " " June 10, 1949 rate entire year | 890,000 | 5.46% |

Note: The rate base used in (a) (b) (c) and (d) has included $1,182,000 of plant under construction and earnings have included an item of $43,000 for interest charged construction. Dropping the plant under construction out of the rate base and $43,000 out of earnings the return is as shown below.

Results of Intrastate Operations, Year 1949

| (1) Calculation of Return | Earnings | Rate of Return |
|---|---|---|
| (e) (same as (a) except for elimination of items listed in note above) | | |
| Rate Base $15,653,000 | | |
| Year 1949 on basis of Jan. 1949 rates | 407,000 | 2.60% |
| " " " " " June 10, 1949 rates entire year | 847,000 | 5.41% |
| (f) (Same as (b) except for elimination of items listed in note above) | | |
| Rate Base $13,613,000 | | |
| Year 1949 on basis of Jan. 1, 1949 rates | 407,000 | 2.99% |
| " " " " " June 10, 1949 rates entire year | 847,000 | 6.22% |
| (g) (same as (c) except for elimination of items listed in note above) | | |
| Rate Base $10,926,000 | | |
| Year 1949 on basis of Jan. 1, 1949 rates | 407,000 | 3.73% |
| " " " " " June 10, 1949 rates entire year | 847,000 | 7.75% |
| (h) (same as (d) except for elimination of items listed in note above) | | |
| Rate Base $15,103,000 | | |
| Year 1949 on basis of Jan. 1, 1949 rates | 407,000 | 2.69% |
| " " " " " June 10, 1949 rates entire year | 847,000 | 5.61%" |

The State Corporation Commission made findings of fact not further referred to, as they are not binding on this court. Seward v. Denver & Rio Grande R. Co., 17 N.M. 557, 131 P. 980, 985, 46 L.R.A., N.S. 242. The commission fixed the value of appellee's property at "more than $13,-000,000" as a basis for rates and charges to the public. The new rates will produce $890,000 net returns after payment of all expenses and taxes; that is, a return of 6.84% on this value.

It is the contention of appellants that the value of appellee's intrastate property as a basis for rates should be its book cost, less depreciation. That there should be deducted from $14,795,000 book cost of its intrastate property, $2,687,000 charged off to depreciation and $1,182,000 added for plant under construction. The result would

be a value for rate basis of $10,926,000 and net earnings of $890,000, or 7.85% on the investment, which rate, it is asserted, is unjust, unreasonable, and extortionate.

The question is whether we have any jurisdiction to intervene judicially in behalf of the public, assuming that the rate is unreasonable and unjust to the public, or at least the appellants.

There are dicta in the Seward opinion that might be construed to mean this court had jurisdiction to protect the public against unjust, unreasonable and extortionate rates fixed by commissions, such as:

" * * * From the action of the commission in fixing the rate, or other determination, an appeal or review in the courts was provided, for the determination of the reasonableness and lawfulness of the order made, but upon the evidence taken in advance before the commission. If the court found the action of the commission unlawful or unreasonable, it was set aside. * * *

" * * * the court should, * * * from the evidence adduced, determine such questions and mete out justice to the company and to the public. * * * We believe it was the intention to, in all cases, accord to both parties a judicial hearing, upon the merits."

Like dicta appears in some early opinions of the Supreme Court of the United States:

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination." The Chicago, Milwaukee, & St. Paul Ry. Co. v. Minnesota, 134 U.S. 418, 10 S.Ct. 462, 467, 702, 33 L. Ed. 970.

"Neither the legislature, nor such commission acting under the authority of the legislature, can establish arbitrarily, and without regard to justice and right, a tariff of rates for such transportation which is so unreasonable as to practically destroy the value of property of persons engaged in the carrying business, on the one hand, nor so exorbitant and extravagant as to be in utter disregard of the rights of the public for the use of such transportation on the other.

"In either of these classes of cases there is an ultimate remedy by the parties aggrieved, in the courts, for relief against such oppressive legislation, and especially in the courts of the United States, where the tariff of rates established either by the legislature or by the commission is such as to deprive a party of his property without due process of law." Concurring opinion of Mr. Justice Miller in Chicago, Milwaukee, etc Co. v. Minn., supra. And see Rea-

gan v. Farmers Loan & Inv. Co., 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014.

The Minnesota case was cited by Chief Justice Roberts in the Seward case in support of his dicta.

But these dicta were not followed where the questions of the rights of the public to a judicial determination of the reasonableness of rates fixed by commissions were issues before the courts. Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075; Robinson v. Baltimore & Ohio Ry. Co. 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288; Van Patten v. Chicago, M. & St. Paul Ry. Co., C.C., 81 F. 545. These cases construe the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and hold in effect that the only redress of shippers was application to the commission for relief by change of published rates. The same rule has generally been followed by state courts.

The regulation of rates to be charged the public by public service corporations is a legislative function which for convenience may be, and ordinarily is, delegated by legislatures and the Congress to commissions. But in this state we have departed from the general rule, and have provided in the Constitution for a commission clothed with such authority, independent of legislative control, which has deprived the legislature of powers that ordinarily belong to that branch of government. But the judicial review provided for by the Constitution is no different from that generally provided for by the laws of other states, and the Congress of the United States, for rate regulation and control of public utilities.

It is generally held that rates charged the public by a public service corporation for its service, fixed or approved by the legislature or its delegated authority acting within its granted powers, are conclusive on the company and customer alike, unless the legislative act fixing such rates, or order of its delegated authority, violates some provision of the state or federal Constitutions.

█ The Constitution of this state, like that of Virginia and Oklahoma, by self-executing provisions established a department of government having jurisdiction over rates and service charges made to customers of public service corporations. This is a departure from the general rule that these are powers belonging to the legislative branch of government. The powers of the State Corporation Commission of New Mexico in fixing or approving such rates are only limited by the review of its orders by this court, as provided by the article creating it, and by the Constitution of the United States. San Juan C. & C. Co. v. Santa Fe, S. J. & N. R. Co., 35 N.M. 512, 2 P.2d 305.

. It was early held that if rates are made so low, either by the legislature or a commission to whom such power is delegated, that a fair return on its investment is not received by the public service corporation it is the taking of property without due process of law, or for public use without just compensation. But it is generally held, yet not without exceptions, Capitol City Gas Co. v. City of Des Moines, C.C., 72 F. 818; Consolidated Gas Co. v. City of N. Y., C.C., 157 F. 849; People's Gas Light & Coke Co. v. Hale, 94 Ill.App. 406, that the remedy of the public is an appeal to the legislature or its delegated authority for redress or protection against unreasonably high rates. The theory is that the legislature is acting for the people; and that no property right is involved, as in the case of public utility corporations.

This is the view this court has taken in a number of cases. The principal question decided in Seaberg v. Raton Public Service Co., 36 N.M. 59, 8 P.2d 100, 101, was whether this court had jurisdiction to set aside rates made by the State Corporation Commission if unreasonable and unjust to the users of electric current. In holding that the authority of the Commission was exclusive, we, through Mr. Justice Watson, said:

"Petitioner's contention as to the removability of the order are, first: That the right of review by a higher tribunal is one which, in fairness, must be reciprocal; if extended to one party, it should be available to the other; and, second, that New Mexico Const. art. 11, § 7, whence the right is derived, extends it to 'any party to such hearing.' The particular provision invoked reads: 'Any party to such hearing before the commission, shall have the same right to remove the order entered therein to the supreme court of the state, as given under the provisions hereof to the company or corporation against which such order is directed.' N.M. Const. art. 11, § 7.

"This brings us again to the consideration of a troublesome bit of Constitution making. The pioneer work has been done, however, and we need only apply principles already established.

"The proceeding of removal is not for the review of judicial action by the commission. It is to test the reasonableness and lawfulness of its orders. The function of the commission is legislative; that of the court, judicial. The commission is not given power to enforce any order; it being merely a rate-making or rule-making body, doing what, if there were no commission, the Legislature alone could do. The court, on the other hand, can make no rate or rule, since it lacks the legislative power.

\*　\*　\*　\*　\*　\*

"As regards the reasonableness of the rates, the commission, the only tribunal to which the public can resort to obtain reason-

able rates, has spoken. It has said that the public has no just cause of complaint. This court can no more review that decision than if it had been made by the Legislature."

In Re Citizens of Belen and Valencia County, 37 N.M. 165, 20 P.2d 272, we approved the Seaberg decision, saying: "The precise question presented by respondent's motion to dismiss was passed upon by this court in Seaberg v. Raton Public Service Co., 36 N.M. 59, 8 P.2d 100, 101. In that case, which must be regarded as determinative of the case at bar, we said: 'As regards the reasonableness of the rates, the commission, the only tribunal to which the public can resort to obtain reasonable rates, has spoken. It has said that the public has no just cause of complaint. This court can no more review that decision than if it had been made by the Legislature.' "

In Re Southern Pacific Co., 37 N.M. 11, 16 P.2d 402, 405 we said: "Protestants rely upon Seaberg v. Raton Public Service Co., 36 N.M. 59, 8 P.2d 100. This case is quite different. In the Seaberg Case there was an application to the constituted tribunal for relief, legislative in its nature. It is not a judicial function to prescribe reasonable rates, and, when the tribunal possessing the power to grant this legislative relief has refused to grant it, it is beyond the power of this court, whose functions are only judicial, to review that action."

The legislature of New York fixed a maximum rate that could be charged by public utility corporations for the sale of gas. In Brooklyn Union Gas Co. v. City of New York, 188 N.Y. 334, 81 N.E. 141, 142, 15 L.R.A.,N.S., 763, it was held that the city of New York could not question the lawfulness of a rate fixed for the use of gas on the asserted ground that it was unreasonable where it was less than the maximum rate fixed by the legislature for cities of its class. The court said: "Whatever price the Legislature permitted the plaintiff to charge must be deemed to be reasonable * * *. When the price of a commodity is established by law, it is not competent for the party purchasing it to resist payment on the ground that the law has permitted the seller to make an unreasonable charge. Hence, when the plaintiff furnished and the defendant received and used the gas; the latter was precluded by statute from raising any controversy such as this with respect to the reasonableness of the charge. In other words, the charge must, *in view of the statute, be deemed reasonable.*" (Our emphasis.)

See 115 App.Div. 69, 100 N.Y.S. 625 and 50 Misc. 450, 100 N.Y.S. 570, 577, for opinions of the appellate division and trial court in the above case. In the latter opinion it was said: "It is true it is the right of the defendant, the consumer, to have gas furnished to it at a reasonable rate. But this

is originally a common-law right although to some extent confirmed by statute. But this is not a property right * * *."

It was also stated that there is a distinction between the public utility corporation and the consumer. That in the case of the former, constitutional rights may be affected by an unreasonable rate but in the case of the latter they cannot be. It was contended that the rights of the consumer were affected in that the fixing of an arbitrary price which the consumer cannot question would be taking the consumer's property without due process of law. But the court said that while there were some cases in which such statements had been made they had been cited without reference to the context or to the facts of the case.

A similar question was before the court in Homestead Co. v. Des Moines Electric Co., 8 Cir., 248 F. 439, 443, 12 A.L.R. 390. A maximum rate had been fixed by the legislature of Iowa for electric service. A commission was not involved. The court said: "A public service corporation furnishing its utility under and pursuant to an act of the Legislature of a state, or under a lawful ordinance of a city, or under other legal provision, which prescribes maximum rates for its service, may fix its own rates, not exceeding the limit thus prescribed, and such rates are presumed to be reasonable. Individuals interested therein as consumers, users, or otherwise may not maintain actions at law or suits in equity against the public service corporation, on the ground that such rates are unreasonable, without having first secured decision or action to that effect by the public tribunal authorized to prescribe the maximum limit of the rates changing the limit, or adjudging the rates complained of unreasonable. (Citing authorities.)

"The application of these rules to the facts pleaded compels the conclusions: (1) That the second and third counts of the complaint state no cause of action, because they are founded on the claim that the rates charged to and collected of the plaintiff were exorbitant, extortionate, and unreasonable, although they were less than the maximum rates prescribed and adjudged reasonable by the city, and that tribunal has never adjudged them unreasonable, or modified the terms or effect of its prescribing ordinance; * * *."

In St. Paul Book & S. Co. v. St. Paul Gaslight Co., 130 Minn. 71, 153 N.W. 262, 263, L.R.A.1918A, 384, P.U.R. 1915D, 474, it was said:

"This is an action in equity, brought by plaintiff in its own behalf and in behalf of the denizens of the city of St. Paul, Minnesota, similarly circumstanced, to enjoin the defendant, a public service corporation, from enforcing an alleged unreasonable and exorbitant schedule of rates adopted by it, which schedule, however, is not claimed to

violate the provisions of an ordinance of the city fixing a maximum price for the distribution and sale of electric current by defendant to patrons within the city. * * *

"The attempt by this suit to fix or establish reasonable and just rates for the future must fail. Prescribing or regulating rates for public service corporations falls within the domain of legislation, and courts should not intrude."

The court stated that the decisive question was whether in a suit by a consumer of a commodity supplied by a public service corporation the court could inquire into the reasonableness of rates fixed by the proper legislative body and enjoin such rates if found exorbitant. The court stated that unreasonably low rates could be enjoined at the suit of the public service corporation, and then stated: "And at first blush a just and necessary corollary of that rule would seem to demand that the same right be accorded the consumer to have a judicial determination whether a rate, established by legislative authority, is so unreasonably high that its enforcement should be enjoined."

A distinction was then made between the consumer and the public utility corporation. Then,

"The former is compelled to furnish the commodity or service; whereas the latter may accept or reject the same at pleasure. Hence only the public service corporation, and not its possible patrons, can, under a strict construction, be held to be deprived of property without due process of law through unreasonable rates. * * *

"We are not strongly impressed with the proposition that at the present time the inhabitants of our large cities can dispense with the utilities supplied by the public service corporations if the price seems too high. They are dependent upon these corporations for matters of daily need and comfort, such as light, water, power, and the like. If these necessities may be obtained only upon the payment of exorbitant prices, it really results in an enforced taking from the consumer of whatever he pays in excess of a reasonable compensation. But there is a practical side to the question which should weigh heavily against the courts entertaining actions, at the instance of the individual consumer, to destroy rates, or render of no effect a maximum price fixed by competent legislative authority for the control of public service corporations. Rate regulation is justly deemed of great importance in securing to the public cheap, efficient, and impartial service from these corporations, and is undertaken by the government or its agencies. Whether done by the nation, state, or municipality, it is by representatives, elected by the people and accountable to them. Such being the case, there is little danger of excessive rates being fixed. But if, perchance, it should hap-

pen, the remedy of the public is by appeal to the rate-fixing body, or, if necessary, by a change·in its membership. If, instead of thus righting the wrong, every consumer is free to seek the injunctional remedy from the courts, no rate schedule would have stability. We know what divergent views consumers have regarding the reasonableness of rates charged by a public service corporation. Every case brought by the individual consumer to test a rate would have to be decided upon the evidence adduced therein. Different cases involving the same rate may have to be determined upon testimony materially unlike, and different judgments result. Neither judges nor juries draw the same conclusion from the same testimony, let alone divergent. Once open the door to actions of this character, and courts would be kept busy. If a statutory rate can be enjoined by a consumer, it would seem to follow that he may also sue for any amount which he deems he has paid in excess of an alleged reasonable rate. It would be almost certain that no two juries would fix upon the same amount as the reasonable rate. We think the result of permitting such litigation at the instance of the individual consumer would be utterly destructive of all legislative regulation of public service corporation rates. * * *

* * * * * *

"Our conclusion is that the reasonableness of the rates for electric current supplied by defendant cannot be raised at the instance of the individual user so long as such rate does not exceed the maximum established by the ordinance referred to."

Also see annotations in L.R.A.1918A 389–390 and 12 A.L.R. 494. To the same effect see Hodge v. Alabama Water Co., 205 Ala. 472, 88 So. 585; McCollum v. Southern Bell Tel. & Tel. Co., 163 Tenn. 277, 43 S.W.2d 390; City of Birmingham v. Southern Bell Tel. & Tel. Co., 234 Ala. 526, 176 So. 301; St. Joseph Stockyards Co. v. U. S., 298 U. S. 38, 56 S.Ct. 720, 80 L.Ed. 1033.

There are statutes, however, which provide that customers of public service corporations or others may appeal to the courts for determination of the reasonableness of rates made by a corporation commission, if it is claimed that such rates are unjust, unreasonable or extortionate. In such cases, of course, resort may be had to the courts for protection against unjust, unreasonable and extortionate rates. City of Huntington v. Public Service Comm., 89 W. Va. 703, 110 S.E. 192; Coal & Coke R. Co. v. Conley, 67 W.Va. 129, 67 S.E. 613; Lowden v. Iowa State Commerce Comm., 229 Iowa 526, 294 N.W. 749; Griffin v. Goldsboro Water Co., 122 N.C. 206, 30 S.E. 319, 41 L.R.A. 240.

We stated in San Juan Coal & Coke Co. v. Santa Fe, S. J. & N. R. Co., 35 N.M. 512, 2 P.2d 305, 307, "The rate-making power of the commission are plenary, except as restricted by those prin-

ciples of constitutional law which would have limited its exercise if it had been entrusted to the Legislature." This may be construed to mean that Sec. 7 of Art. 11 of the state Constitution is subject to some other provision of that instrument. It is our view that if the commission acts *within the authority given it by Art. 11 of the New Mexico Constitution,* its order fixing or approving rates is binding on all parties, *unless* it violates some provision of the Constitution of the United States, which protects such corporations against unreasonable rates made by state authorities, such as would effect the confiscation of their property. But the commission represents the public, and as to it, rates made or approved by the commission are conclusively presumed to be reasonable, if made as provided by Art. 11 of the State Constitution, and do not violate some provision of the Constitution of the United States.

If this were the only question we would be compelled to dismiss the appeal. But the question of whether the order of the commission is void for other constitutional reasons has been raised.

In this state the authority of the commission to make rates is stated as follows: "The commission shall have power and be charged with the duty of fixing, determining, supervising, regulating and controlling all charges and rates of railway, express, telegraph, telephone, sleeping-car, and other transportation and transmission companies and common carriers within the state; * * * The commission shall have power to change or alter such rates, to change, alter or amend its orders, rules, regulations or determinations, and to enforce the same in the manner prescribed herein; provided, that in the matter of fixing rates of telephone and telegraph companies, due consideration shall be given to the earnings, investment and expenditure as a whole within the state. * * *" Sec. 7, Art. 11, N.M.Const.

There are constitutional limitations on the power of the commission to fix or approve rates, one of which is contained in the provision just quoted, as follows: "* * * provided, that in the matter of fixing rates of telephone and telegraph companies, due consideration shall be given to the earnings, investment and expenditures as a whole within the state." Sec. 7, Art. 11, N.M.Const.

Another is: "The commission shall determine no question or issue any order in relation to the matters specified in the preceding section (Sec. 7), until after a public hearing held upon ten days notice to the parties concerned, except in case of default after such notice." Sec. 8, Art. 11, N.M. Const. Also see Sec. 10, Art. 11, not material here.

■ . This quoted provision from Sec. 7 of Art 11 clearly implies that at the public

hearing provided for by Sec. 8 there must be evidence introduced to prove the value of the corporation's property, as well as its earnings and expenditures, as a basis for fixing or approving rates, and in determining its value by the commission "due consideration shall be given to the earnings, investment and expenditure as a whole within the state." Rates fixed or approved by the commission without a hearing are void, In re Atchison, T. & S. F. Ry. Co., 44 N.M. 608, 107 P.2d 123; and unless due consideration is given to the earnings, investment and expenditures as a whole within the state in fixing values of public utility corporations' property as a basis for rate making, an order fixing or approving such rates is void.

Appellants contend that it is implicit in this provision of the Constitution that the word "investment" means the original or book cost of appellee's property less depreciation, and that this basis of value is fixed by the Constitution, and it alone can be used to establish value for rate making purposes. If appellants have correctly defined "investment" then their conclusion is correct. In Colorado Interstate Gas Co. v. Federal Power Comm., 324 U.S. 581, 65 S.Ct. 829, 833, 89 L.Ed. 1206, it was said: "Congress to be sure has provided for judicial review of the Commission's orders. * * * But that review is limited to keeping the Commission within the bounds which Congress has created. When Congress, as here, fails to provide a formula for the Commission to follow courts are not warranted in rejecting the one which the Commission employs unless it plainly contravenes the statutory scheme of regulation. If Congress had prescribed a formula it would be the duty of the Commission to follow it."

There are three factors that must be considered in determining the question of what is a fair return on property of public utility corporations; (1) gross earnings, (2) value of the property used in the business, and (3) cost of operations. These factors were designated in Sec. 7, supra, as earnings, investment and expenditure in the order named, but these are not necessarily all of such factors. The only difficulty is as to the meaning intended by the use of the word "investment." The appellant would restrict its meaning to the original cost less depreciation, whereas appellee contends it is the present cost new less depreciation. If the appellant is correct, and the commission is compelled to adopt this formula, the value as a rate base of property used by the appellee for intrastate purposes would be $10,926,000; if the appellee is correct the value as a rate base is $16,835,000. As the net income under the new rates is estimated to be $847,000, the net return on the investment based on appellants' value is 7.75 percent; whereas the net return on the value contended for by appellee is 5.03 percent. The

commission made the indefinite finding that the property value *exceeded* $13,000,000. Assuming the intention on the part of the commission to fix $13,000,000 as the value for a rate base, the return on the investment is 6.51 percent.

We are of the opinion that the word "investment" is used in the sense of value of the property used in the business, for rate making purposes, and has no reference to any particular formula. That seems to be supported by the following authorities cited by appellee (appellants have cited none): Consolidated Gas Co. v. City of New York, C.C., 157 F. 849; West v. Probst, Tex.Com.App., 6 S.W.2d 96; Tampa Electric Co. v. Watson, 146 Fla. 695, 1 So.2d 739.

If it had been intended that the factor of value should be cost less depreciation, it would have been so stated in no uncertain language. See U. S. ex rel. Maine Potato Growers & Shippers Ass'n v. Interstate Commerce Comm., D.C., 88 F.2d 780, 782, in which the court said:

"* * * Section 15a (2), as amended June 16, 1933, 48 Stat. 220, 49 U.S.C.A. § 15a (2) provides: 'In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic; to the need, in the public interest, of adequate and efficient railway transportation serv-ice at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service.'

"Putting aside all questions of relative importance of the various elements of rate-making—because the controlling facts in each case necessarily vary—there can be no doubt that in prescribing reasonable rates the Commission is required to take into consideration, *among other factors,* (those named above) * * *. But the weight to be given to these several factors is left to the discretion of the Commission, as is also the weight to be given the other and unnamed factors which of necessity vary in substance according to the facts."

Here we should dispose of the contention of appellee that the case of Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, lays down the rule for the determination of values for rate making purposes. It should be stated that the doctrine of this case, while followed for many years, has been criticised so severely by later decisions that it has but little, if any, value in determining a formula for rate making. In Federal Power Comm. v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 743, 86 L.Ed. 1037, the Supreme Court said: "Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the

pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

In a concurring opinion by Justices Black, Douglas and Murphy, it is said: "While the opinion of the Court erases much which has been written in rate cases during the last half century, we think this is an appropriate occasion to lay the ghost of Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, which has haunted utility regulation since 1898. That is especially desirable lest the reference by the majority to 'constitutional requirements' and to 'the limits of due process' be deemed to perpetuate the fallacious 'fair value' theory of rate making in the limited judicial review provided by the Act."

Appellants cite the following articles critical of the Smyth case: 36 Georgetown Law Journal 487; 63 Harvard Law Review 1116; 42 Michigan Law Review 1049; 32 California Law Review 398, and others.

Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 287, 88 L.Ed. 333, was a similar case. It involved interstate gas rates under the Natural Gas Act, 15 U.S.C.A. § 717 et seq. The commission had based value for rate purposes upon the actual legitimate cost of the company's interstate property, less depletion and depreciation, and plus unoperated gas acreage, working capital and future net capital additions. The rate base value was fixed by the commission at $34,-000,000. The company claimed a reproduction cost value of $97,000,000 upon which it claimed an 8 percent return. The Federal Power Commission allowed a six and a half percent return on the $34,000,000 value. The commission's order was set aside by the Circuit Court of Appeals, which the Supreme Court reversed. In sustaining the commission the Supreme Court said:

"Congress has provided in § 4(a) of the Natural Gas Act that all natural gas rates subject to the jurisdiction of the Commission 'shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.' Sec. 5(a) gives the Commission the power, after hearing, to determine the 'just and reasonable rate' to be thereafter observed and to fix the rate by order. Sec. 5(a) also empowers the Commission to order a 'decrease where existing rates are unjust * * * unlawful, or are not the lowest reasonable rates.' "

"The Circuit Court of Appeals set aside the order of the Commission for the following reasons. (1) It held that the rate base should reflect the 'present fair value' of the property, that the Commission in determining the 'value' should have considered reproduction cost and trended original cost, and that 'actual legitimate cost' (prudent investment) was not the proper measure of 'fair value' where price levels had changed since the investment."

"The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. * * * It does, however, indicate that 'fair value' is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.

"We held in Federal Power Comm. v. Natural Gas Pipeline Co., supra, [315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037], that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' Id., 315 U.S. at page 586, 62 S.Ct. at page 743, 86 L.Ed. 1037. And when the Commission's order is challenged in the court, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Id., 315 U.S. at page 586, 62 S.Ct. at page 743, 86 L.Ed. 1037. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. * * * The rate-making process under the Act, i. e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests. Thus we stated in the Natural Gas Pipeline Co. case that 'regulation does not insure that the business shall produce net revenues.' 315 U.S. at page 590, 62 S.Ct. at page 745, 86 L.Ed. 1037. But such considerations aside, the investor interest has a legitimate concern with the

financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. * * * By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. * * * The conditions under which more or less might be allowed are not important here. Nor is it important to this case to determine the various permissible ways in which any rate base on which the return is computed might be arrived at. For we are of the view that the end result in this case cannot be condemned under the Act as unjust and unreasonable from the investor or company viewpoint."

The authority of the Federal courts under the Natural Gas Act, 15 U.S.C.A. § 717 et seq., is specific and precise, and greater than this court's under Art. 11 of the Constitution. In Cities Service Gas Co. v. Federal Power Comm., 155 F.2d 694, 698 (certiorari denied 329 U.S. 773, 67 S.Ct. 191, 91 L.Ed. 664), the Circuit Court of Appeals, 10th circuit, opinion by Judge Murrah, said the following:

"It hardly seems necessary or appropriate to reiterate what has already been so emphatically said concerning the 'broad area of discretion' committed to the Commission in the exercise of its statutory jurisdiction, to determine just and reasonable rates for the transportation and sale of natural gas subject to its jurisdiction, or to remind ourselves that if the Commission's order prescribing 'just and reasonable rates', when viewed in its entirety, produces no arbitrary result, judicial inquiry is at an end. It is said that a finding of reasonableness made after a full hearing by the Commission is the product of 'expert judgment', which carries with it a strong presumption that it meets the statutory requirements. And since the constitutional requirements are no more exacting than the statutory standards of the Act, there is an almost conclusive presumption that an order which meets the statutory standards does not exceed the bounds of due process. * * * Thus, the Commission is statutorily and constitutionally free to use any rate-making formula it chooses, so long as the end result it produces will allow the regulated company to operate successfully, maintain its financial integrity, attract capital, and compensate its investors for the risk assumed. * * *

"It is said that 'rates cannot be made to depend upon "fair value" when the value of the going enterprise depends on earnings under whatever rates may be anticipated.'

Hope Natural Gas Co. case, supra, 320 U.S. [591], at page 601, 64 S.Ct. [281], at page 287, 88 L.Ed. 333. In other words, fair value * * * is no longer deemed an essential ingredient of an economic rate base for rate-making purposes. * * *

"* * * since Congress had prescribed no formula for the separation of the regulable from the non-regulable sales, and since rate-making is essentially a legislative function, the courts were not warranted in rejecting the method selected by the Commission 'unless it plainly contravenes the statutory scheme of regulation.' Colorado Interstate Gas Co. case, 324 U.S. at page 589, 65 S.Ct. [829], at page 833, 89 L. Ed. 1206. The appropriateness of the formula raises questions of fact, not of law, Colorado Interstate Gas Co. case, supra, and involves the exercise of informed judgment and discretion by those whose duty it is to make the 'pragmatic adjustments * * * called for by the particular circumstances.'"

In Panhandle Eastern Pipe Line Co. v. Fed. Power Comm., 324 U.S. 635, 65 S.Ct. 821, 828, 89 L.Ed. 1241, the court said: "Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L. Ed. 333, holds that the Commission is not bound to use any single formula for the fixing of rates. It is not precluded from using actual legitimate cost as it did here.

The question on review is not the method of valuation which was used but the end result obtained since the issue is whether the rate fixed is 'just and reasonable.' § 5. In the present case the 6½ per cent return allowed by the commission will permit petitioner to earn $4,363,925 annually on the basis of the test year after meeting all operating expenses which include depreciation, exploratory and development costs, and federal income taxes."

It is therefore firmly settled by the Supreme Court of the United States that in a similar case the question is not the method of valuation which is used in fixing a basis for rates "but the end result obtained since the issue is whether the rate fixed is 'just and reasonable.'"

This was the view of this court as expressed in the Seward case: "While it is proper for the Commission to make findings of fact, still such findings can have no force or effect in this court. Our Constitution does not require this court to consider or give any effect to such findings, but enjoins that this court shall 'decide such cases on their merits.' It does not even, as is usually the case, make the order of the Commission prima facie just and reasonable, but, on the other hand, requires this court to pass upon the merits of the case, without indulging in any presumptions. This being true, it is our duty to

338

take the order made by the Commission and test its reasonableness and lawfulness by the evidence adduced upon the hearing. This court forms its own independent judgment, as to each requirement of the order, upon the evidence; therefore the findings made by the Commission, may not be justified by the evidence, yet if the evidence sustains the reasonableness and lawfulness of the order made it would be our duty to uphold and enforce it.". [17 N.M. 557, 131 P. 989]

■ The commission should not burden the public with unreasonable or extortionate rates, considering the circumstances of each case, though in some cases the public utility corporation may only pay a meager, or no return on its investment. There is a zone of reasonableness between confiscation and extortion in which the commission's jurisdiction to make rates should be confined.

"But regulation does not insure that the business shall produce net revenues, nor does the Constitution require that the losses of the business in one year shall be restored from future earnings by the device of capitalizing the losses and adding them to the rate base on which a fair return and depreciation allowance is to be earned. Galveston Electric Co. v. City of Galveston, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678; San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 446, 447, 23 S.Ct.

571, 573, 574, 47 L.Ed 892. The deficiency may not be thus added to the rate base for the obvious reason that the hazard that the property will not earn a profit remains on the company in the case of a regulated, as well as an unregulated business." Federal Power Comm. v. Nat. Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 745, 86 L.Ed. 1037. See also Market Street Ry. Co. v. Railroad Comm., 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171.

There are a number of other questions presented that we do not deem it necessary to consider; the principal one being whether the state had the right of removal at all in this case, and assuming that it did, whether the attorney general was authorized to represent it in the Supreme Court. It appears from the order of the commission that it arrived at its rate base of $13,000,000 by taking an average of three figures which were presented by the appellee's and appellants' witnesses:

1. The average investment $13,513,000
2. The original cost less depreciation 10,926,000
3. Current cost new less depreciation 15,103,000

The average is $13,180,000.

■ It is believed that the contention of appellants that $1,182,000 for plant under construction was included in the value for

a rate base, is not borne out by the record. We are of the opinion that it should not have been included unless a reasonably accurate estimate of the increase in income that will be received by reason of the new construction is also included.

We have extended our review beyond what was necessary to determine the case. We have not jurisdiction to set aside a rate if made by the commission as provided by the Constitution, though it may be unjust and unreasonable to the public, for the reasons we have heretofore stated. The question has been raised but a few times in the state and federal courts, as the inclination of commissions is to fix rates too low rather than too high. But unless the constitution is amended to give this court jurisdiction to prevent unreasonable rates as they apply to the public, we are unable to more than express an opinion on the present situation. The increase of rates is certainly large. It may be that they are unreasonable; that perhaps will depend on future considerations after construction in progress and new construction contemplated have been completed. It would be difficult at this time to determine what will be reasonable rates. The commission, of course, has the jurisdiction at any time to reconsider the question if the facts warrant it.

It follows from what has been said that the order heretofore entered denying the motion to dismiss should be set aside and another entered dismissing this proceeding.

It is so ordered.

LUJAN, SADLER, McGHEE, and COMPTON, JJ., concur.